2006 UT 81

**Ralph Leroy MENZIES, Plaintiff and Appellant,**

v.

**Hank GALETKA, Utah State Prison Warden, Defendant and Appellee.**

No. 20040289.

Supreme Court of Utah.

Dec. 15, 2006.

---

**45.** *See id.* § 31A–22–303(2).

**46.** Utah Code Ann. § 31A–22–314 (2005).

**47.** *Black's Law Dictionary* 807 (7th ed.1999).

**48.** Utah Code Ann. § 31A–22–314.

484

⚷641.13(1)

⚷641.13(1)

Elizabeth Hunt, Salt Lake City, for plaintiff.

Mark L. Shurtleff, Atty. Gen., Thomas Brunker, Erin Riley, Asst. Attys. Gen., Salt Lake City, for defendant.

DURHAM, Chief Justice:

¶ 1 In this case, Ralph Leroy Menzies, a death row inmate, appeals from the district court's dismissal of his petition for post-conviction relief. Menzies filed a claim for post-conviction relief in 1995, after having previously exhausted his grounds for direct appeal. On March 3, 1998, attorney Edward K. Brass was appointed by the district court to represent Menzies. From that date until his withdrawal on September 9, 2003, Brass willfully disregarded nearly every aspect of Menzies' case. As a result, the court imposed discovery sanctions, granted summary judgment in favor of the State, and ultimately dismissed Menzies' petition for post-conviction relief.

¶ 2 Following the dismissal of Menzies' case, Brass withdrew and new counsel was appointed. Menzies then moved to set aside the district court's dismissal of his petition for post-conviction relief pursuant to rule 60(b) of the Utah Rules of Civil Procedure. Menzies' 60(b) motion was primarily based on claims that Brass' actions were grossly negligent and amounted to ineffective assistance of counsel. The district court denied Menzies' motion (the 60(b) ruling). Menzies now requests that we reverse the district court's 60(b) ruling. Menzies also challenges a discovery order that the district court entered pursuant to an evidentiary hearing held on Menzies' 60(b) motion, arguing that the district court improperly compelled Menzies to disclose privileged work product. We hold that the district court erred in denying Menzies relief under rule 60(b)(6) of the Utah Rules of Civil Procedure and that the discovery order entered by the district court did not comply with the standard for the discovery of attorney work product set forth in *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997).

## BACKGROUND

¶ 3 Before reciting the facts in this case, it is necessary to discuss our review of the district court's factual findings. We have reviewed the factual findings contained in the district court's 60(b) ruling for clear error, as is our practice when reviewing issues of fact. *Chen v. Stewart*, 2005 UT 68, ¶ 1 n. 1, 123 P.3d 416. However, our review of the record in this case indicates that the district court clearly erred in numerous factual findings that were crucial to its decision. We therefore decline to recite the facts in a manner consistent with the district court's ruling and instead recite them in accordance with our review of the record. *Id.*

¶ 4 The facts pertinent to this appeal arise from Menzies' lengthy post-conviction litigation, particularly the representation he received from attorney Edward K. Brass between February 1998 and September 2003. We begin our synopsis with some background information on the initial criminal proceedings. On March 8, 1988, Menzies was found guilty of first degree murder and aggravated kidnapping. Menzies waived his right to a jury for the penalty phase of his trial and was subsequently sentenced to death by the district court. Following his sentencing, Menzies filed a motion for a new trial, which was denied. Menzies appealed to this court, which affirmed the district court's denial of the motion and directed Menzies to proceed with his direct appeal on the merits. *State v. Menzies*, 845 P.2d 220, 242 (Utah 1992). Menzies did so, arguing that numerous prejudicial errors had occurred at trial. We ultimately denied all of Menzies' claims, affirming the jury's guilty verdict as well as the district court's imposition of the death penalty. *State v. Menzies*, 889 P.2d 393, 406–07 (Utah 1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 910, 130 L.Ed.2d 792 (1995).

## I. THE INITIAL POST–CONVICTION PROCEEDINGS

¶ 5 On April 20, 1995, Menzies filed a petition for post-conviction relief; he amended his petition on May 2, 1995.[1] In his

---

1. Attorney Mary C. Corporon was Menzies' counsel of record when post-conviction proceedings were initiated on April 20, 1995. Ms. Corporon was joined by co-counsel Alan L. Sullivan, Matthew M. Durham, and Todd M. Shaughnessy on May 2, 1995. Together, these four attorneys

amended petition, Menzies asserted seventy-three separate claims for relief, including claims that his trial counsel had provided ineffective assistance. On November 13, 1995, the State moved to dismiss the first seventy-one claims, arguing that the Utah Supreme Court had previously rejected them. However, the State's motion did not address Menzies' ineffective assistance claims.

¶ 6 On December 13, 1995, the State moved the district court for permission to conduct discovery by serving interrogatories on Menzies and deposing him, his original trial counsel, and other witnesses. Menzies opposed the motion, asserting that any discovery should be tailored to avoid breaching attorney-client and constitutional privileges. On February 7, 1996, Menzies moved the district court to direct the State to provide attorney fees as well as funds for both expert witnesses and an investigation of his claims of innocence, including a potential alibi that was allegedly not investigated by trial counsel in Menzies' underlying criminal case. Menzies indicated that the motion would be supported by the affidavit of a private investigator to be filed with the court.

¶ 7 On April 3, 1996, the district court entered an order deferring ruling on the State's motion to dismiss until after an evidentiary hearing could be held on the ineffective assistance of counsel claims. The court also set a timetable for the State and Menzies to file responsive memoranda to their respective motions. The court held another hearing regarding the State's motion for discovery and Menzies' motion for attorney fees and investigatory funds on May 6, 1996. On June 12, 1996, the district court ordered that the State be allowed to conduct limited discovery and that Menzies be awarded $2,000 to pay for an alibi investigation. In this order, the district court found that Menzies had partially waived his attorney-client privilege as to the records of his defense counsel, the Salt Lake Legal Defender Association (LDA), by claiming ineffective assistance of trial counsel in his post-conviction petition.

The court also found that in order to prevent Menzies' right of habeas corpus from being unlawfully suspended, it was necessary to provide Menzies with funds to investigate his claims, specifically his claims regarding an uninvestigated alibi defense. The court deferred ruling on Menzies' request for attorney fees until an evidentiary hearing could be held. The State filed an interlocutory appeal from this order.

¶ 8 On May 17, 1996, the State served its first set of interrogatories on Menzies. On June 7, 1996, the State also served the LDA attorneys who had represented Menzies during his criminal trial with subpoenas duces tecum to have their depositions taken and requests to produce all documents relating to their representation of Menzies. On June 19, 1996, LDA intervened and filed a motion for redetermination and clarification of the district court's order granting discovery. LDA argued that Menzies had not waived the attorney-client privilege and that even if he had, the waiver was limited by the subject matter of Menzies' claims and the right against self incrimination. LDA also moved the district court for a protective order preventing the discovery of privileged attorney-client information from current or former LDA attorneys. Finally, LDA requested that the district court stay the depositions and discovery procedures pending the resolution of its motions.

¶ 9 On July 8, 1996, the State filed a motion requesting that the district court compel Menzies to respond to the interrogatories that the State had served him on May 17. On July 9, 1996, LDA filed a motion requesting that the court either quash the subpoenas duces tecum the State had served on its attorneys or issue a protective order limiting the production of privileged LDA documents relating to Menzies' criminal trial. On July 10, 1996, Menzies also moved for a protective order, asking that the LDA attorneys not be deposed and that he be relieved from having to respond to the State's interrogatories. Menzies argued that there was inadequate time to review the documents

represented Menzies pro bono in all post-conviction proceedings until Brass was appointed on

February 13, 1998.

requested by the State to determine privilege issues. Menzies also noted that the State had not yet paid the $2,000 in investigative funds ordered by the district court and that he could not fully answer the State's interrogatories until the alibi investigation was completed. In addition, Menzies moved to stay the proceedings pending the State's appeal from the district court's interlocutory order regarding investigative funds to the Utah Supreme Court.

¶ 10 The district court conducted a hearing regarding LDA's July 8 motion on July 16, 1996. At the hearing, the court stayed all motions pending the State's interlocutory appeal and gave the State until July 19, 1996, to respond to Menzies' motions. The court also stayed the depositions of the LDA attorneys, which had been scheduled for July 18, 1996, and stated that they were to be rescheduled pending a hearing on the various motions on August 6, 1996. During the interim, the court ordered LDA to produce the non-privileged information that the State had requested and to prepare a privilege log as to the rest. Finally, the court ordered the State to pay Menzies the $2,000 in investigative funds as required by its prior order. The State did indeed provide Menzies with a check for $2,000 on July 19, 1996, reserving the right to challenge the district court's order requiring payment and to seek repayment from Menzies if the order was vacated.

¶ 11 Prior to the July 16 hearing, the State had prepared a proposed order regarding the discovery of LDA documents; the State amended its proposed order in light of the July 16 hearing and provided it to Menzies and LDA on July 22, 1996. On July 29, 1996, Menzies moved to extend the time for responding to the State's proposed order and to strike the August 6 hearing because he had not received a copy of the transcript from the July 16 hearing and thus could not properly object to the State's proposed order. The district court granted Menzies' motion on both counts. On August 6, 1996, LDA filed a memorandum, joined by Menzies, objecting to the State's proposed order.

¶ 12 On August 23, 1996, the State moved the district court for leave to take Menzies' deposition. On September 3, 1996, Menzies filed motions for a protective order and to stay all discovery. Menzies argued that the State had impermissibly made its payment of the $2,000 in investigative funds conditional on its right to seek repayment if the district court's order was overturned. Menzies asserted that this condition made it impossible for him to spend the funds because he was indigent and did not have the means to repay the funds in the event the State later sought to recover them. According to Menzies, he could not proceed with discovery—through answering interrogatories and being deposed—unless the investigative funds were made available and an investigation was completed.

¶ 13 On September 9, 1996, the State filed memoranda responding to Menzies' motions and LDA's objection to the State's proposed discovery order. The district court held a hearing regarding both issues. It ruled that the proposed order was sufficient as written and that any objections to the discoverable materials in LDA's possession could be handled through in-camera reviews by the court. Accordingly, the court executed the State's proposed discovery order. With regard to Menzies' motions, the court denied both of them but ordered that the $2,000 in investigative funds be paid to Menzies with no restrictions. Finally, the court granted the State's motion to depose Menzies and to compel him to answer its interrogatories before October 9, 1996. On October 15, 1996, LDA filed its privilege log with the district court. On October 22, 1996, the State moved for sanctions, asking that the district court strike Menzies' ineffective assistance of counsel claims because Menzies had failed to answer the State's interrogatories by October 9, as directed by the court.

¶ 14 On November 1, 1996, Menzies petitioned this court to allow him to appeal from the district court's June 12 order regarding the provision of investigative funds and also filed a motion to stay the post-conviction proceedings in the district court pending our decision. We denied the motion to stay without prejudice on November 18, 1996. After the State filed a motion to dismiss and a memorandum in opposition, Menzies withdrew his petition. Menzies then petitioned

this court for a writ of extraordinary relief, again requesting that this court review the district court's June 12 order to determine the adequacy of the investigative funds. According to Menzies, the amount of investigative funds awarded by the district court was not sufficient to conduct an adequate investigation; Menzies' private investigator suggested in his affidavit that a reasonable estimate would be at least $8,250. He stated that he had identified twenty-six areas of investigation, "each extensive and critical to a determination of guilt," that had not been adequately investigated during the guilt phase of Menzies' trial.

¶ 15 On January 2, 1997, we consolidated this petition with several other cases involving similar issues under the caption *Menzies v. Galetka*. On January 23, 1997, this court denied Menzies' petition for extraordinary relief, concluding that the preliminary conditions necessary for the grant of a writ under rule 65B of the Utah Rules of Civil Procedure did not exist. However, we also stated that if Menzies challenged the adequacy of the investigative funds in the district court and the court denied him the relief requested, he could then petition this court for interlocutory relief, in which case we would address the adequacy issue in connection with the disposition of the other consolidated cases.

¶ 16 On January 31, 1997, this court issued its decision in the related case of *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997), wherein LDA had petitioned this court for extraordinary relief from the district court's September 16 order. *Id.* at 589. In that case, we clarified the procedures courts should follow when applying the work product doctrine to privileged documents sought in discovery. *Id.* at 590–91. We granted LDA's petition, vacated the district court's September 16 order regarding the production of LDA documents, and ordered the district court to supervise discov-

ery in accordance with the standards set forth in our opinion. *Id.* at 591.

¶ 17 On January 10, 1997, Menzies filed his answers to the State's first set of interrogatories. The State subsequently withdrew its motion for sanctions. On February 3, 1997, Menzies filed with the district court a motion to increase the funds available for investigation fees to at least $8,250, based on the private investigator's affidavit. The State opposed the motion. The district court heard the issue on February 24, 1997, and it denied Menzies' request for additional funds, ordered Menzies to use an in-state investigator, and again reserved ruling on Menzies' request for attorney fees until after an evidentiary hearing.

## II. POST–CONVICTION LEGISLATION AND MR. BRASS' APPOINTMENT

¶ 18 Meanwhile, in proceedings before this court involving the district court's order awarding Menzies' investigative fees, the State had filed a motion suggesting that the issue may be moot given the recent passage of House Bill 60, enacting Part 2 of the Post–Conviction Remedies Act, Capital Sentence Cases, which governs the appointment and payment of counsel in post-conviction death penalty proceedings. Utah Code Ann. §§ 78–35a–201 to –202 (2002). We granted the State's motion on April 28, 1997, noting that the parties had agreed to voluntarily stay proceedings in the district court until after July 1, 1997, the date on which the new legislation and associated rules went into effect.[2] After the new legislation became effective, both parties sought to have the district court appoint new counsel qualified under rule 8 of the Utah Rules of Criminal Procedure, as required by the newly enacted Utah Code section 78–35a–202(2)(a). On October 1, 1997, the State notified Menzies' counsel that the Utah Division of Fi-

---

2. The pertinent legislation is contained in Utah Code section 78–35a–202 (2002). Under this section, counsel appointed to represent an indigent petitioner must be "qualified to represent defendants in death penalty cases as required by Rule 8 of the Utah Rules of Criminal Procedure." *Id.* § 78–35a–202(2)(a). In addition, this section specifies that compensation for counsel and liti-

gation expenses are to be paid from state funds by the Division of Finance pursuant to administrative rules adopted under the Utah Administrative Rulemaking Act. *Id.* § 78–35a–202(2)(c); *see also* Utah Admin. Code r. 25–14 (2001) (setting forth current payment scheme for attorney fees and litigation expenses in post-conviction death penalty cases).

nance had implemented rules that might allow Menzies to receive payment from the state for attorney fees and litigation expenses. In a letter to the State dated October 13, 1997, Menzies' counsel stated that she did not feel comfortable applying for compensation under the provisions adopted by the Utah Division of Finance because Menzies' pro bono team had not been appointed by the court and did not meet the requirements of rule 8, as required by section 78–35a–202(2)(a). Menzies' counsel further represented her belief that the case could not proceed until an attorney meeting the rule 8 requirements, who was willing to represent Menzies, could be located.

¶ 19 On October 27, 1997, the State requested that the district court appoint new counsel qualified under rule 8 to represent Menzies. Menzies' counsel also filed a motion arguing that his pro bono team collectively did not met the rule 8 requirements and asking the court to appoint new counsel. The district court held a hearing on the State's motion on November 3, 1997, and determined that "[n]ew counsel must be appointed." The court ordered Menzies' counsel to prepare and submit a list of attorneys qualified under the new rule 8 who would be willing to accept the appointment, along with affidavits regarding the attorneys' backgrounds and qualifications. Pursuant to this order, Menzies' counsel submitted a report to the district court on November 12, 1997, identifying thirteen attorneys whom she believed were qualified to represent Menzies. Of these thirteen, five were unable to take the case because of undisclosed conflicts. Menzies' counsel sent a letter to the remaining eight attorneys inviting them to repre-

sent Menzies, but had received no responses as of November 12. No affidavits were included with the November 12 report.

¶ 20 Kenneth R. Brown, one of the attorneys identified in the November 12 report and contacted by Menzies' counsel, filed an affidavit with the district court on December 3, 1997. In his affidavit, Brown stated that he was unwilling to represent Menzies for a host of reasons. At the time, the Utah State Department of Finance Regulations placed a $25,000 cap on compensation for attorneys representing plaintiffs in post-conviction death penalty cases which included investigation and expert witness fees. According to Brown, Menzies had uninvestigated claims of actual innocence that Brown estimated would cost $25,000 to properly investigate. In addition, Brown stated that no mitigation investigation had been conducted in the underlying trial and one would be necessary in order to properly litigate Menzies' post-conviction claims. Such an investigation "would cost well in excess of $25,000." Under these circumstances, Brown believed that the funds available to any attorney undertaking Menzies' representation would be "grossly inadequate" because the necessary investigation alone would cost nearly three times the total amount authorized by the state. Therefore, Brown felt that any attorney representing Menzies would be placed "in an immediate ethical conflict" because he or she "would be forced to choose between receiving compensation ... and conducting no reasonable investigation whatsoever, or alternatively, throwing all of [the funds] into a still-inadequate investigation, and going without any compensation."[3] Accordingly, Brown declined to represent Menzies.

---

**3.** The current regulations contain a tiered system for the payment of attorney fees, which compensates counsel according to the procedural stage of the post-conviction proceedings reached. *See* Utah Admin. Code r. 25–14–4. Under this system, the maximum amount of compensation an attorney may receive for representing a petitioner in a post-conviction death penalty case is $37,500. *Id.* Under these rules, the Division of Finance will also "pay reasonable litigation expenses not to exceed a total of $20,000 in any one case for court-approved investigators, expert witnesses, and consultants." Utah Admin. Code r. 25–14–5. While these regulations provide more funding for post-conviction death penalty

proceedings than their predecessors, we note the potential disability that the statutory cap may impose. If Mr. Brown's affidavit is correct regarding the funds needed to secure Menzies a proper post-conviction proceeding, it may be the case that this statutory scheme imposes a crippling burden on Menzies. However, at this stage in the litigation, the record is incomplete, and the issue is not before the court. On remand, Menzies' current counsel must determine what investigation is needed and present any challenge to the statutory cap to the district court to rule on as a factual matter, subject to adversary testing.

¶ 21 On December 16, 1997, the State filed a second motion requesting that the district court appoint rule 8 qualified counsel for Menzies. In its motion, the State indicated that the only attorney contacted by Menzies' counsel who had responded was Brown and he had declined to represent Menzies. The State argued that "[i]n order to proceed with this action a Rule 8 qualified attorney must be appointed by the Court to represent the petitioner's interests." The State also stated that "[f]urther delay in making the appointment of counsel is not in the best interest of the petitioner who has alleged, among other claims, his 'actual innocence.' " On December 23, 1997, Menzies' counsel filed a supplemental report to update the district court regarding her search for rule 8 qualified counsel. In the report, Menzies' counsel indicated that she had received replies to her letter soliciting a rule 8 qualified attorney for Menzies from four of the eight recipients. Each of these attorneys had declined to represent Menzies, most for the same reasons as Brown. Menzies' counsel further stated that the attorneys she had contacted constituted all of the potentially qualifying attorneys of whom she was aware.

¶ 22 On January 29, 1998, the district court held a second hearing regarding the appointment of rule 8 qualified counsel. The court ordered Menzies' counsel to continue trying to contact attorneys to represent Menzies and gave her until February 5 to do so. On February 4, 1998, pursuant to a request from the district court judge's clerk, Menzies' counsel submitted a letter to the district court indicating the eight attorneys who had been contacted and their responses. The letter indicated that four of the attorneys had responded in the negative and the other four had still not responded.

¶ 23 On February 3, 1998, attorney Edward K. Brass sent a letter to Menzies' counsel stating that he would be interested in representing Menzies if they were still seeking counsel. On February 13, 1998, at yet another hearing regarding the appointment of rule 8 qualified counsel, Menzies' counsel told the court about Brass' letter. The court contacted Brass, he appeared and agreed to represent Menzies, and the district court approved the appointment. It does not appear that the district court ever actually conducted an inquiry into whether Brass was qualified to represent Menzies under rule 8. On March 3, 1998, the court entered an order appointing Brass to represent Menzies in all proceedings before the court. Menzies' pro bono team subsequently withdrew their representation but remained available to consult with Brass. In the 60(b) ruling, the district court stated that "Mr. Brass believed he was appointed for the sole purpose of representing Petitioner at the evidentiary hearing." While Brass' affidavit does contain a statement to this effect, nothing else in the record indicates that his representation was limited in such a manner. The letter Brass sent to Menzies' counsel simply stated that Brass was willing to take the case. At the hearing at which Brass was appointed, the district court did not set any limit on his representation. Also, the district court's order appointing Brass, which he signed, actually states that "Edward K. Brass is appointed to represent Mr. Menzies in *all* proceedings before this court" (emphasis added). Most telling, at an evidentiary hearing held on January 16, 2004, Brass himself stated that his representation of Menzies was not limited in any way. Nor would a limitation on Brass' representation have been appropriate given that the district court and counsel for both parties had just conducted a four-month search for rule 8 qualified counsel and Brass was the only attorney willing to take the case. Any limitation would also have run counter to the post-conviction regulatory framework. Under the Utah Administrative Code,

> [a]ll appointed counsel, by accepting the court appointment to represent an indigent client sentenced to death and by presenting a Request for Payment to the Division of Finance, agree to provide *all* reasonable and necessary post-conviction legal services for the client, including timely filing an action under the provisions of Title 78, Chapter 35a, Post–Conviction Remedies Act and representing the client in *all legal proceedings conducted thereafter* including, if requested by the client, an appeal to the Utah Supreme Court.

Utah Admin. Code r. 25–14–3 (emphasis added). The record indicates that Brass re-

quested and received from the Division of Finance an initial appointment fee of $5,000 pursuant to rule 25–14–4(1) of the Utah Administrative Code.

## III. BRASS' REPRESENTATION

¶ 24 Brass served as Menzies' counsel from February 13, 1998, when the district court appointed him, until he withdrew on September 9, 2003. To say that Brass did little to represent Menzies during this five-and-a-half-year period would be an understatement. In fact, Brass' representation in this case was deplorable. Our review of the record indicates that Brass not only failed to provide Menzies with any meaningful representation, but in fact willfully disregarded nearly every aspect of this case. In effect, Brass defaulted Menzies' entire post-conviction proceeding, resulting in the dismissal of Menzies' case.

¶ 25 To begin with, Brass communicated with Menzies only sparingly throughout his representation. He discussed the issues in the case at length with Menzies only once—for one to two hours during an initial meeting—and thereafter rarely spoke with his client, appearing to deliberately avoid any communication. Menzies consistently attempted to contact Brass by telephone to discuss various aspects of the case. Brass' office rarely answered Menzies' calls, frequently refused to accept collect calls from the prison,[4] and even hung up when they realized it was Menzies calling. This practice was conducted pursuant to Brass' instructions. Even when the staff accepted Menzies' phone calls and took messages, Brass seldom returned them. Telephone records indicate that Menzies attempted to call Brass' office literally hundreds of times but actually spoke with Brass or a member of his staff only on a handful of occasions.

¶ 26 Menzies also tried to communicate with Brass through letters and cards. In these letters, Menzies repeatedly pleaded with Brass to contact and update him on the status of his case. Brass did not keep Menzies informed about the procedural posture or progress of the case, nor did he send Menzies copies of any of the documents filed by the State, even though Menzies requested that he do so multiple times. In his communications with Brass, Menzies consistently maintained his innocence and frequently asked Brass and his staff to make sure that the case was progressing. In particular, Menzies wanted Brass to conduct alibi and mitigation investigations, repeatedly expressing concern that delaying the investigation of these matters would be harmful to his case. In its 60(b) ruling, the district court made much of the fact that Menzies told Brass in several letters that he had full confidence in him and to take whatever time was needed. According to the district court, Menzies "was aware of circumstances that called into question the quality of Mr. Brass' representation and the progress of his case," and "despite his concerns with Mr. Brass' representation and the lack of progress in his case, [Menzies] intentionally acquiesced in the delay of his case by keeping Mr. Brass as his attorney." However, a careful reading of the record shows that Brass—when Menzies was able to communicate with him—and several other attorneys and staff members who were affiliated with Brass, repeatedly told Menzies to have faith in Brass' representation and that Brass would do a good job. Moreover, Brass himself has indicated that Menzies asked him to resolve the case without delay. Thus, a more accurate reading of the record is that Menzies kept Brass as his attorney because he was not fully aware of the status of his case, and he was continually reassured that Brass was taking care of things.

¶ 27 Brass never conducted or hired anyone to conduct an investigation, notwithstanding Menzies' requests and the fact that the record indicates that extensive investigation on these subjects was needed in order to properly litigate Menzies' claims. After he was appointed, Brass received a letter from Menzies' prior counsel informing him that she had the $2,000 in investigative funds previously awarded by the court in her possession. However, Brass never sought or

---

4. Menzies' telephone access is limited by the prison, and he has been denied telephone access at various times during this litigation. Moreover, the prison phone system requires Menzies to call his attorneys collect.

obtained these funds from her;[5] the record also indicates that Brass did not consult Menzies' pro bono team about the case. Nor did Brass ever challenge the adequacy of the funds or request any additional funds from the Division of Finance. In fact, the only funding Brass ever requested or received in connection with his representation of Menzies was his initial $5,000 appointment fee.

¶ 28 Brass' representation of Menzies before the district court was equally deficient. Shortly after Brass was appointed, the district court held a scheduling conference to establish cutoff dates for Menzies to file a second amended petition for post-conviction relief, for discovery, and for the parties to file dispositive motions. A scheduling order was then entered giving Menzies until April 16, 1998, to file his second amended petition. However, Brass failed to file a petition by that date. On July 15, 1998, the district court modified the prior scheduling order and gave Menzies until August 17, 1998, to file his petition. On July 22, 1998, the court held another scheduling conference wherein it modified several other cutoff dates and also ordered LDA to produce all relevant documents by November 9, 1998. Brass again failed to file Menzies' second amended petition by the modified deadline. On August 31, 1998, Brass finally filed a two-page second amended petition, which did little more than re-state the arguments that had been made in the first amended petition filed by Menzies' pro bono counsel on May 2, 1995.

¶ 29 On September 25, 1998, the State filed both its answer to and a motion to dismiss Menzies' second amended petition. As in its original motion to dismiss, the State argued that all of Menzies' claims except those relating to ineffective assistance of trial counsel should be dismissed because they had either been raised on direct appeal or could have been raised on direct appeal. Brass did not file a brief opposing the State's motion. On October 8, 1998, the State moved the court to extend the discovery deadline from October 15 to December 15, citing a need to review an index of all LDA documents relating to the underlying criminal trial in order to complete

discovery. The court granted this motion on October 29.

¶ 30 On November 24, 1998, the State provided notice that it intended to depose Menzies on December 10. However, on December 9, Brass cancelled the deposition. On December 22, the district court held a hearing on the State's motion to dismiss. The court granted the State's unopposed motion and ordered that the first seventy-one claims for post-conviction relief asserted in Menzies' amended petition be dismissed. On that same day, the State filed a motion to compel Menzies' deposition; the court ordered Menzies to respond by January 4, 1999. Brass never filed a response.

¶ 31 On February 2, 1999, Menzies, the State, and LDA moved the court to vacate, amend, and clarify the discovery order of September 16, 1996, to conform to this court's decision in *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997). The court did so on February 4, issuing an order addressing all of the previous discovery-based motions filed by the parties. The court ordered LDA to produce all documents not protected by the work product doctrine and to prepare an index of all remaining documents. LDA filed its privilege log with the court on April 9, 1999.

¶ 32 On June 11, the district court entered an order granting the State's motion to compel Menzies' deposition, noting that the motion was unopposed. On July 19, the district court extended the discovery cutoff date, ordering that the parties complete discovery by December 31, 1999. On September 2, 1999, the State filed a motion for permission to schedule Menzies' deposition. The court granted the motion, and following several cancellations due to conflicts in the parties' schedules, Menzies' deposition was scheduled for November 5, 1999. On November 4, Brass again called counsel for the State and told them that it would be inappropriate for Menzies to be deposed before an alibi investigation could be conducted. Brass apparently made this assertion notwithstanding the fact that he had made no effort to conduct such an investigation. Menzies' deposition, how-

---

5. When the State learned that Brass had never obtained these funds, it moved to have the money refunded; the district court granted the State's motion on March 31, 2004.

ever, proceeded as scheduled. Brass did not attend but instead sent Julie George, an attorney who was neither rule 8 qualified nor familiar with the case in any way. When George arrived at the prison, Menzies did not know who she was and was not even aware that the deposition was scheduled. Nonetheless, Menzies participated in the deposition, answering certain questions and refusing to answer others on George's advice. The deposition was finally terminated when Menzies, acting on George's advice, asserted his right under the Fifth Amendment to refuse to answer questions about his communications with the attorneys who represented him in his criminal trial.

¶ 33 On December 3, 1999, the State filed a second motion to compel Menzies' deposition. In its motion, the State requested that the court instruct Menzies on the extent of the Fifth Amendment privilege, order Menzies to answer all questions not protected by the privilege, and impose sanctions precluding Menzies from introducing evidence in the event Menzies refused to answer. On December 23, 1999, the State moved to strike the discovery deadline due to the delays. Brass failed to file a response to either of the State's motions, and the court subsequently granted both of them. The State rescheduled Menzies' deposition for June 1, 2000, and completed deposing Menzies on that date. Brass represented Menzies at the deposition, again asserting a blanket objection to the deposition.

¶ 34 On October 9, 2000, the State filed a motion seeking permission to serve Menzies with additional interrogatories. Once again, Brass did not file any response to the State's motion. On December 4, 2000, the court granted the State's motion, and an order to this effect was entered on December 20, 2000. On December 18, 2000, the State served Menzies with a document production request and a second set of interrogatories. When Menzies did not timely respond, the State notified Brass on January 24 via hand-delivered letter that it would move for an order compelling discovery if it did not receive the outstanding discovery by February 9, 2001. Brass did not respond to the letter and did not provide the State with any of the

requested discovery. Consequently, on February 15, 2001, the State moved the court to compel Menzies' discovery responses. Brass again filed no response to the State's motion to compel. On March 28, 2001, the district court granted the State's motion to compel and ordered Menzies to immediately provide the requested discovery. In its order, the court stated, "The extensive period since discovery began has provided [Menzies] with ample opportunity to investigate his claims; consequently, [Menzies] should have the information to answer the outstanding discovery readily available."

¶ 35 Despite the court's order, Brass did not provide the State with any of the requested discovery. Brass likewise did not inform Menzies of his failures to comply with discovery and did not send Menzies copies of any of the State's discovery requests. Indeed, at an evidentiary hearing held before the district court, Brass acknowledged that Menzies did not have personal knowledge of any of the discovery issues at a time that he could have done anything about them. In fact, Menzies did not even know that Brass had defaulted on the various discovery motions until August 12, 2003. Brass has since stated that he did not respond to any of the State's discovery requests because he had not done any investigation and therefore had no information to provide. Brass has also acknowledged that he could have informed the district court that he did not comply with discovery because of his failure to investigate and could have requested more time in order to do so. He did neither of these things.

¶ 36 On April 19, 2001, the State moved for sanctions pursuant to rule 37 of the Utah Rules of Civil Procedure, requesting that the court prohibit Menzies from introducing any evidence to support his claims beyond what was already in the record. In its motion, the State argued that sanctions were warranted because Menzies had willfully refused to respond to discovery requests and had purposely delayed the proceedings. Once again, Brass failed to respond. Brass did not inform Menzies that the State had moved for sanctions and did not provide Menzies with a copy of the State's motion. Nor did he communicate with the district court regarding

the reasons for his discovery failures. On June 27, 2001, the district court granted the State's motion, thereby prohibiting Menzies from introducing any further evidence to support his claims. Brass did not tell Menzies about the court order or explain to Menzies that he could no longer investigate his claims.

¶ 37 On October 29, 2001, the State moved for summary judgment. The State sought to dismiss Menzies' entire post-conviction petition, arguing that because Menzies could not introduce any further evidence to support his claims, the State was entitled to a judgment as a matter of law on the existing record. Brass made no effort to defeat the State's motion; he has subsequently stated that he did not even review the record to attempt to find disputed material facts. Brass has also testified that he was not in a position to know whether the facts were in dispute because he had not investigated Menzies' claims. Again, Brass failed to respond to the State's summary judgment motion. He likewise did not contact the court to ask for more time or to inform the court as to why the facts were not in dispute. Nor did Brass inform Menzies about the State's motion or send Menzies a copy of it. On December 7, 2001, the district court granted the State's summary judgment motion. An order to this effect was entered on January 11, 2002, dismissing Menzies' petition in its entirety with prejudice.

¶ 38 On January 23, 2002, Brass spoke with Menzies on the telephone. Menzies asserts that Brass told him the State was trying to get a summary judgment, but not to worry about it because there was a discovery stay in place for the State. If Brass said this, it was an outright lie; the record reflects that no discovery stay was ever imposed, and the State's summary judgment motion had already been granted due to Brass' failures to comply with discovery. In any event, Brass did not communicate with Menzies for nearly a year following this conversation, even though Menzies repeatedly tried to contact him both by telephone and through letters. At no point did Brass inform Menzies that his case had actually been dismissed.

¶ 39 On February 11, 2002, Brass filed a notice of appeal with the district court indicating that he was appealing the summary judgment to the Utah Supreme Court. However, Brass did not file a docketing statement within the time required by rule 9 of the Utah Rules of Appellate Procedure, and this court dismissed the appeal. We then allowed Menzies to avoid the dismissal by filing a transcript request; Brass indicated that no transcript was required. We set a briefing schedule, but Brass never filed an appellate brief even though we twice granted him additional time to do so. The State filed a motion to dismiss the appeal, and Brass failed to respond. We dismissed Menzies' appeal on November 21, 2002, but indicated that if a brief were filed within ten days we would reinstate the appeal. Brass never filed a brief, so we entered a notice of decision dismissing Menzies' appeal on December 19, 2002. Brass did not inform Menzies of any of these developments.

¶ 40 While the faulty appeal was proceeding in this court, Brass filed with the district court a motion to set aside the summary judgment pursuant to rule 60(b) of the Utah Rules of Civil Procedure on April 11, 2002. This motion was not accompanied by a memorandum but stated that "[t]he specific grounds for this motion shall be set forth in a subsequent memorandum." Brass never filed a supporting memorandum.

¶ 41 On December 30, 2002, nearly a year after the case had been dismissed, Brass finally sent a letter to Menzies informing him about the summary judgment. In the letter, Brass stated, "The Attorney General's office has managed to obtain a summary judgment in your writ based upon our alleged failures to comply with certain discovery requests on their part. This is my responsibility and not yours. I am doing what is necessary to have this set aside." Menzies received this letter on January 2, 2003. Menzies wrote a reply letter to Brass that same day. He expressed that he did not know what discovery requests Brass was referring to and asked Brass to contact him as soon as possible to explain why the summary judgment had been entered. Following Menzies' letter, Brass made no contact with Menzies for nearly two

months. On January 10, 2003, the State requested permission from the district court to file a late response to Menzies' unsupported motion to set aside. Again, Brass filed no responsive memoranda, and the State filed a notice to submit the matter for decision on January 29, 2003. Before the district court could rule on the matter, however, Judge Lewis was assigned to the case. Brass promptly notified the State of a potential conflict; Judge Lewis had performed Brass' wedding. On March 6, 2003, Judge Lewis recused herself from the case, and the case was subsequently reassigned to Judge Brian.

¶ 42 Brass finally visited with Menzies at the prison on March 5, 2003. At the meeting, Brass informed Menzies that he was going to need a new lawyer, although he did not tell Menzies that he was going to withdraw or give Menzies any impression that he was going to stop representing him. Brass also told Menzies once again that he was doing what was necessary to set aside the summary judgment. Brass did not discuss the procedural history of the case with Menzies, explain his various defaults that led to summary judgment, or tell Menzies that he had defaulted the appeal and failed to file a memorandum supporting the motion to set aside.

¶ 43 In June of 2003, Menzies' current counsel, attorney Elizabeth Hunt, attended a capital litigation seminar. While attending the seminar, Hunt was asked to check on Utah's death row cases to ensure that nothing "was falling through the cracks." On July 21, 2003, Hunt contacted Thomas Brunker, the State's counsel of record in this case. Brunker informed Hunt about Menzies' case, and Hunt promptly contacted Menzies and began researching and preparing to represent him. On August 12, 2003, Hunt showed Menzies the case dockets and explained the procedural posture of the case. This was the first time that Menzies had knowledge that Brass had defaulted during the discovery process, that the summary judgment had been imposed due to these defaults, and that Brass had defaulted in the appeal. On that same day, Hunt filed an appearance as Menzies' counsel, a motion to appoint rule 8 qualified counsel, and a memo-

randum supporting the 60(b) motion to set aside the summary judgment that Brass had filed over a year earlier. In the memorandum supporting the 60(b) motion, the bulk of Menzies' argument focused on the errors made by Brass that led to summary judgment.

¶ 44 On August 29, 2003, the State filed a memorandum opposing the 60(b) motion. On September 9, 2003, Brass withdrew as counsel. He has subsequently admitted that while he may technically meet the requirements of rule 8, he "do[es] not understand the complex procedural rules governing capital cases in state and federal post-conviction" proceedings, and that he "cannot adequately represent a capital defendant in post-conviction cases." The 60(b) motion was argued before the district court on September 22, 2003, and the matter was taken under advisement. On November 6, 2003, Hunt was formally appointed to represent Menzies. On November 7, the district court scheduled an evidentiary hearing for December 15, 2003, in order to obtain evidence relating to communications between Brass and Menzies during the period of Brass' representation. The State moved for permission to conduct discovery in preparation for the evidentiary hearing, and Menzies opposed the motion. On December 4, 2003, the district court entered an order allowing both parties to conduct discovery in preparation for the evidentiary hearing and continued the hearing until January 15, 2004. The State subsequently requested that Menzies produce all documents relating to communications with his prior post-conviction counsel—both Brass and the pro bono team that had first represented him. The State's theory appears to have been that the evidence pertaining to the pro bono team was relevant to Brass' diligence, for if their investigation had been damaging or unfruitful, it would explain Brass' failure to investigate.

¶ 45 Menzies objected to the State's request, arguing that the material the State sought was protected work product. The disputed materials appear to have been documents created by the private investigator for Menzies' prior pro bono counsel based on his preliminary investigation. He filed an index

of withheld documents that he requested the judge to review in-camera, and moved for a protective order and for permission to file the protected documents under seal. In his motions, Menzies asked the district court to follow the standard for the discovery of attorney work product set forth in *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997). At a hearing held on January 7, 2003, the district court denied Menzies' motions, ordered Menzies to produce all the documents that had previously been withheld, and allowed the State to make working copies of the disputed documents but ordered them not to disseminate the information to any third parties. The evidentiary hearing proceeded as planned on January 15. Menzies again objected when the State began referring to the disputed documents. The court took the matter under advisement and reviewed *Uno* as well as the disputed documents over the evening recess. When the court reconvened the next day, it ruled that the disputed documents were inadmissible. It also ordered the State not to make any copies of the documents and to destroy the copies it already possessed at the conclusion of the hearing. The court indicated that if the State wished to question witnesses based on the materials, it should discuss the matter at side bar along with Menzies' counsel, "and then the questioning will proceed on a question-and-an-opportunity-to-object basis for each question." Following the evidentiary hearing, Menzies filed a proposed order relating to the destruction of the documents the district court had ruled inadmissible at the evidentiary hearing. The State objected to Menzies' proposed order, arguing that it went beyond the scope of the court's instructions, and filed its own proposed order.

¶ 46 On February 26, 2003, the court issued its 60(b) ruling. The court analyzed Menzies' claims under four separate subsections of rule 60(b): 60(b)(1) and 60(b)(4) through (6). The court found that Brass' representation clearly constituted ineffective assistance of counsel, stating that Brass' actions "were inexplicable failures to follow rudimentary procedural requirements and comply with court-ordered deadlines." According to the court, Brass' "inaction appears to have been willful and deliberate rather than the result of ignorance or carelessness." While the court held that Menzies should not be held accountable for Brass' failures, it held that Menzies could be held accountable for his own failures. According to the district court, Menzies "must still exercise that level of diligence that a reasonably prudent person in his circumstances would exercise." The court found that "a reasonably prudent person in [Menzies'] circumstances would have, at a minimum, contacted the court about his concerns" and "would have dismissed Brass as counsel of record." The court thus held that Menzies had acted unreasonably under the circumstances and denied his motion for 60(b) relief.

¶ 47 On April 5, 2004, the district court issued its order regarding the destruction of the documents that had been held inadmissible at the January 15 evidentiary hearing. The court ordered the State to destroy all the documents that had been on Menzies' index of withheld documents unless any of the documents had already been in its possession or were provided to the State from another source. In addition, the court ordered the State not to disseminate the information contained in the documents or investigate matters learned of from its review of the documents.

¶ 48 On April 22, 2004, Menzies filed a notice of appeal with the district court indicating that he would seek review of the court's denial of 60(b) relief as well as the order regarding the destruction of the inadmissible documents. Menzies' appeal is now before this court. We have jurisdiction pursuant to Utah Code Ann. § 78-2-2(3)(i) (2002).

## POST–APPEAL MATTERS

¶ 49 Before addressing the merits of Menzies' appeal, we must first dispose of two additional procedural matters that arose after Menzies' appeal was filed with this court. Each party has filed with this court a motion regarding issues that are extraneous to the substantive issues on appeal. We first address the motion filed by the State and then the motion filed by Menzies.

¶ 50 Following Menzies' record designation, the State moved to strike certain transcripts that it contended were not part of the record considered by the district court in ruling on the rule 60(b) motion. We conditionally granted the State's motion, requiring Menzies' counsel to file an affidavit indicating whether the transcripts were referenced during the rule 60(b) proceedings and explaining the transcripts' relevance to those proceedings. After both the affidavit and the briefing in this matter were filed, the State renewed its motion, requesting that we strike from the record transcripts that were not before the district court as well as Menzies' arguments relying on the challenged transcripts.

¶ 51 We have reviewed Menzies' citations to the challenged transcripts and conclude that the State's arguments are without merit and irrelevant. Contrary to the State's assertions, several of the transcripts challenged by the State are not even referenced in Menzies' briefing. Moreover, some of the transcripts actually were before the district court during the rule 60(b) proceedings. Most importantly, every factual proposition for which Menzies cites the challenged transcripts is supported by citations to other portions of the record that were before the district court during the rule 60(b) proceedings. We therefore deny the State's motion to strike the portions of Menzies' argument that rely on the challenged transcripts. We note that we have not relied on those transcripts that were not before the district court for any portion of this opinion, as we generally do not consider new evidence on appeal.

¶ 52 After oral argument, Menzies' counsel filed a letter styled as supplemental authority—the third she has filed since we took this matter under advisement—as well as a motion requesting that we take judicial notice of letters and oral statements made by counsel for the State in two other proceedings.[6] Menzies' counsel also made a vague request that we require the State's counsel to provide "all relevant information" related to the other proceedings. According to Menzies, the State has taken a position in these other proceedings that is counter to the State's argument in this case. Namely, the state argued that criminal defendants should not engage in ex parte communications with the court but then claimed that Menzies is negligent for not contacting the district court to notify it of Brass' errors. Because this information is irrelevant to our decision, we deny Menzies' motion.

¶ 53 Before addressing the merits of this case, we pause to comment on the litigation the parties have engaged in regarding the two matters discussed above. The voluminous record in this case covers twenty years of litigation, both during the trial stage and post-conviction phase. The briefing in this case is also extensive and includes a multitude of legal arguments as well as references to portions of the record relating to the entire twenty-year history of the case. Resolving a case such as this is a time-intensive task. Yet the parties chose to add to that task by filing the two motions discussed above, each of which also involved extensive briefing. In fact, the briefing on these two motions alone far exceeds the quantity of briefing we frequently receive on entire cases. We do not consider such voluminous briefing on extraneous issues to be a particularly good use of judicial resources. We therefore admonish both the parties in this case and parties appearing before us in the future to constrain their litigiousness to issues both relevant and material to the matters before this court.

## STANDARD OF REVIEW

¶ 54 The majority of Menzies' arguments on appeal deal with the district court's 60(b) ruling. A district court has broad discretion to rule on a motion to set aside a default judgment under rule 60(b) of the Utah Rules of Civil Procedure. *See Lund v. Brown*, 2000 UT 75, ¶ 9, 11 P.3d 277; *Russell v. Martell*, 681 P.2d 1193, 1194 (Utah 1984); *State Dep't of Soc. Servs. v. Musselman*, 667 P.2d 1053, 1055 (Utah 1983). Thus, we review a district court's denial of a 60(b) motion

---

6. We note that the information Menzies attempts to provide is not supplemental authority as considered by rule 24(j) of the Utah Rules of Appel-

late Procedure but is extra-record evidence, which we typically do not consider on appeal. *Low v. Bonacci*, 788 P.2d 512, 513 (Utah 1990).

under an abuse of discretion standard of review. *Russell,* 681 P.2d at 1194. However, we have emphasized that "the [district] court's discretion is not unlimited." *Lund,* 2000 UT 75, ¶ 9, 11 P.3d 277. It is well established that 60(b) motions should be liberally granted because of the equitable nature of the rule. *Id.* ¶ 10. Therefore, a district court should exercise its discretion in favor of granting relief so that controversies can be decided on the merits rather than on technicalities. *See id.; Musselman,* 667 P.2d at 1055–56. Accordingly, it is an abuse of discretion for a district court to deny a 60(b) motion to set aside a default judgment if there is a reasonable justification for the moving party's failure and the party requested 60(b) relief in a timely fashion. *Lund,* 2000 UT 75, ¶ 11, 11 P.3d 277.

¶ 55 In addition, a district court's ruling on a motion to set aside a default judgment "must be based on adequate findings of fact and on the law." *Id.* ¶ 9 (citation and internal quotation marks omitted). We review a district court's findings of fact under a clear error standard of review. *Chen v. Stewart,* 2005 UT 68, ¶ 1 n. 1, 123 P.3d 416. We review a district court's conclusions of law for correctness, affording the trial court no deference. *Richins v. Delbert Chipman & Sons Co.,* 817 P.2d 382, 385 (Utah Ct.App. 1991) (reviewing district court's conclusions of law in context of a 60(b) motion for correctness). If a district court's ruling on a 60(b) motion is based on clearly erroneous factual findings or flawed legal conclusions, the district court has likely abused its discretion. *See Lund,* 2000 UT 75, ¶ 9, 11 P.3d 277.

¶ 56 Here, the substantive issue underlying the district court's 60(b) ruling was Menzies' claim that Brass provided ineffective assistance of counsel. A claim of ineffective assistance of counsel presents a mixed question of law and fact. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Traditionally, this court has reviewed a lower court's factual findings for clear error, but has reviewed the application of the ineffective assistance standard to the facts for correctness-even when the claim is initially heard by the dis-

trict court, *see Wickham v. Galetka,* 2002 UT 72, ¶¶ 7, 19, 61 P.3d 978 (analyzing ineffective assistance of counsel issue as question of law even where trial court had already rejected the claim), or is remanded to the district court for an evidentiary hearing, *see State v. Lovell,* 1999 UT 40, ¶ 22, 984 P.2d 382 ("Having remanded this case for an evidentiary hearing on the conflict [of interest] issue under Rule 23B of the Utah Rules of Appellate Procedure, we defer to the trial court's findings of fact but treat the conflict issue as a question of law.").

¶ 57 However, this court has not yet evaluated the appropriate standard of review for ineffective assistance of counsel claims under the test we set forth in *State v. Pena,* 869 P.2d 932, 938–39 (Utah 1994), and modified in *State v. Levin,* 2006 UT 50, ¶ 25, 144 P.3d 1096. Accordingly, we take this opportunity to reevaluate whether correctness is the proper standard of review.

¶ 58 Under *Levin,* we consider three factors to determine whether we should give some deference to a district court's application of a specific legal doctrine to the facts:

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies on "facts" observed by the trial judge, "such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts;" and (3) other "policy reasons that weigh for or against granting discretion to trial courts."

*Id.* (citation omitted). While the first factor, the variability of the facts, would favor granting deference to the district court, the second and third factors weigh heavily against it. Ineffective assistance of counsel claims are a unique species of claim that are frequently raised for the first time on appeal and are regularly decided based on the record. Even when we remand for an evidentiary hearing under rule 23B of the Utah Rules of Appellate Procedure, we rely on the facts found and placed in the record and do

not defer to the district court's ultimate legal decision. *Lovell,* 1999 UT 40, ¶ 22, 984 P.2d 382. Therefore, the trial court's direct observations do not generally play a role in determining whether a defendant received effective assistance of counsel and it is unnecessary to grant deference to the district court in the minority of cases where an ineffective assistance of counsel claim is first raised before that court. Accordingly, we review for correctness the trial court's application of the law to the facts, but we will overturn the district court's findings of fact only if they are clearly erroneous.

▮ ¶ 59 Finally, Menzies' appeal of the district court's order regarding the destruction of the documents ruled inadmissible at the evidentiary hearing held on January 16, 2004, deals with an issue of discovery. We review a district court's ruling on a discovery issue for abuse of discretion. *Green v. Louder,* 2001 UT 62, ¶ 37, 29 P.3d 638.

## ANALYSIS

¶ 60 On appeal, Menzies raises the following arguments: (1) the district court erred in denying him relief under rule 60(b) of the Utah Rules of Civil Procedure; (2) the district court's ruling that Menzies was negligent for failing to either dismiss Brass or notify the court of Brass' failures is premised on clearly erroneous findings of fact; (3) by holding Menzies liable for failing to either dismiss Brass or notify the court of Brass' failures, the district court allowed an inadvertent waiver of Menzies' fundamental rights; (4) the district court's order regarding the destruction of privileged documents ruled inadmissible at the evidentiary hearing held on January 16, 2004, did not cure the court's violation of the standard set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997); and (5) this court should invoke its equitable and supervisory

power over habeas corpus cases to ensure that justice is done.

▮ ¶ 61 We hold that the district court's 60(b) ruling constituted an abuse of discretion because Menzies is entitled to relief under rule 60(b)(6) due to Brass' ineffective assistance of counsel and gross negligence.[7] We have already noted our disagreement with the district court's factual findings, so we do not address Menzies' second argument at length. However, we agree with Menzies that the district court abused its discretion by finding that it would be inequitable to grant Menzies relief because he was negligent for not contacting the court and for keeping Brass as his attorney. Because the district court relied on these findings to dispose of several of Menzies' 60(b) arguments, we address this issue in our 60(b) discussion. Finally, we hold that the district court erred in its application of *Uno* and that its order regarding the destruction of privileged documents in the State's possession must be supplemented.

▮ ¶ 62 While the issues before us deal only with Menzies' 60(b) motion, we must not lose sight of the fact that the case before us is a post-conviction petition seeking habeas corpus relief from a death penalty sentence. A post-conviction proceeding is a proceeding of constitutional importance, over which the judiciary has supervisory responsibilities due to our constitutional role. In discharging this role, we must recognize the stakes involved in post-conviction proceedings, take appropriate steps to satisfy ourselves of the reliability of convictions and death sentences, and ensure that a petitioner's fundamental rights are adequately protected.[8] As this court has previously noted, "[T]he law should not be so blind and unreasoning that where an injustice has resulted the [plaintiff] should be without remedy." *Martinez v. Smith,* 602

---

7. Because our ruling under rule 60(b)(6) is dispositive of Menzies' 60(b) arguments, we do not address the arguments raised under any other portion of that rule. Because our holding under 60(b)(6) grants Menzies his requested relief, we likewise do not address his argument that a post-conviction petitioner cannot waive the right to post-conviction review through misconduct. We do note, however, that a court must conduct a waiver analysis before allowing an indigent

death row petitioner to waive his or her right to counsel in post-conviction proceedings. *See* Utah Code Ann. § 78–35a–202(2)(a) (2002).

8. For an analysis of the framework underlying post-conviction habeas corpus petitions, *see Hurst v. Cook,* 777 P.2d 1029, 1032–36 (Utah 1989).

P.2d 700, 702 (Utah 1979). With this framework in mind, we address the merits of Menzies' claims.

## I. THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING MENZIES' 60(b) MOTION

¶ 63 On appeal, Menzies argues that the district court abused its discretion by denying his motion to set aside Brass' defaults under multiple provisions of rule 60(b) of the Utah Rules of Civil Procedure. Specifically, Menzies claims that he is entitled to relief under rule 60(b)(1) and 60(b)(4) through (6). The pertinent portions of rule 60(b) state as follows:

> On motion and upon such terms as are just, the court may in the furtherance of justice relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; ... (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time and for reason[ ] (1), ... not more than 3 months after the judgment, order, or proceeding was entered or taken.... The procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

Rule 60(b) is an equitable rule designed to balance the competing interests of finality and fairness. *See Lund v. Brown*, 2000 UT 75, ¶ 10, 11 P.3d 277; *Laub v. S. Cent. Utah Tel. Ass'n.*, 657 P.2d 1304, 1306 (Utah 1982). In balancing these competing interests, the district court must consider all of the attendant circumstances. *See Katz v. Pierce*, 732 P.2d 92, 93 n. 2 (Utah 1986); *Heath v. Mower*, 597 P.2d 855, 858 (Utah 1979); *Olsen v. Cummings*, 565 P.2d 1123, 1124 (Utah 1977). Because of the equitable nature of the rule, a district court has broad discretion to rule on a 60(b) motion. *Lund*, 2000 UT 75, ¶¶ 9–10,

11 P.3d 277. However, this discretion is tempered by the fact that the rule is designed to be remedial and must be liberally applied. *Id.* ¶ 10; *see also Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1169–70 (9th Cir.2002) (discussing rule 60(b)(6) of the Federal Rules of Civil Procedure). "[J]udgment by default is an extreme measure and a case should, whenever possible, be decided on the merits." *Tani*, 282 F.3d at 1170 (citation and internal quotation marks omitted); *see also State Dept. of Soc. Servs. v. Musselman*, 667 P.2d 1053, 1055 (Utah 1983) (same). Accordingly, a district court "should be generally indulgent toward" vacating default judgments, *Katz*, 732 P.2d at 93, and must "incline towards granting relief in a doubtful case to the end that the party may have a hearing." *Lund*, 2000 UT 75, ¶ 10, 11 P.3d 277 (citations and internal quotation marks omitted). Thus, "it is quite uniformly regarded as an abuse of discretion to refuse to vacate a default judgment where there is a reasonable justification or excuse for the ... failure ... and timely application is made to set it aside." *Id.* ¶ 11 (citations and internal quotation marks omitted).

¶ 64 In general, a movant is entitled to have a default judgment set aside under 60(b) if (1) the motion is timely; (2) there is a basis for granting relief under one of the subsections of 60(b); and (3) the movant has alleged a meritorious defense. *See Erickson v. Schenkers Int'l Forwarders, Inc.*, 882 P.2d 1147, 1149 (Utah 1994); *Musselman*, 667 P.2d at 1055–56. These considerations should be addressed in a serial manner. *See Erickson*, 882 P.2d at 1149. In other words, there is no need to consider whether there is a basis for setting aside a default judgment if the motion was not made in a timely manner, and no need to consider whether there is a meritorious defense if there are not grounds for relief. *See id.; see also Musselman*, 667 P.2d at 1056 ("[I]t is unnecessary, and moreover inappropriate, to even consider the issue of meritorious defenses unless the court is satisfied that a sufficient excuse has been shown."). Accordingly, in determining whether the district court abused its discretion in denying Menzies' 60(b) motion, we consider these elements in turn.

## A. *Menzies' 60(b) Motion Was Timely*

¶ 65 The first question we must consider is whether Menzies' 60(b) motion was timely. A motion under 60(b) must "be made within a reasonable time and for reason[ ] (1) ... not more than 3 months after the judgment ... was entered." Utah R. Civ. P. 60(b). In cases where subsection (b)(1) applies, a movant may not attempt to circumvent the three-month filing period by relying on another subsection. *Russell v. Martell,* 681 P.2d 1193, 1195 (Utah 1984); *Laub v. S. Cent. Utah Tel. Ass'n.,* 657 P.2d 1304, 1308 (Utah 1982); *Richins v. Delbert Chipman & Sons Co.,* 817 P.2d 382, 387 (Utah Ct.App.1991). Under rule 60(b), a reasonable time "depends upon the facts of each case, considering such factors as the interest in finality, the reason for the delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." *Gillmor v. Wright,* 850 P.2d 431, 435 (Utah 1993) (citations and internal quotation marks omitted). In general, the moving party satisfies the reasonable time requirement if she shows "that she acted diligently once the basis for relief became available, and that the delay in seeking relief did not cause undue hardship to the opposing party." *Workman v. Nagle Constr., Inc.,* 802 P.2d 749, 752 (Utah Ct.App.1990) (citation and internal quotation marks omitted).

¶ 66 In the case before us, the district court's judgment dismissing Menzies' case was entered on January 11, 2002. Brass filed Menzies' 60(b) motion exactly three months later, on April 11, 2002. This motion was not accompanied by a supporting memorandum, but instead stated that "[t]he specific grounds for this motion shall be set forth in a subsequent memorandum." However, Brass never filed a subsequent memorandum, and the 60(b) motion was not supported until Hunt entered her appearance and filed a supporting memorandum on August 12, 2003. Thus, sixteen months elapsed between the time Brass filed the 60(b) motion and the time that motion was properly briefed. Our task is to determine whether Menzies' 60(b) motion was timely filed under these circumstances.

¶ 67 The State argues that Menzies' 60(b) motion was insufficient under the Utah rules governing motion practice and was therefore untimely. The State argues that the motion did not meet rule 7(b)(1) of the Utah Rules of Civil Procedure, which states that "[a] motion shall be in writing and state succinctly and with particularity the relief sought and the grounds for the relief sought." The State also argues that Menzies' motion was required to "be accompanied by a memorandum of points and authorities ... relied on in support of the motion." Utah Code J.D. Admin. 4–501(1)(A) (repealed 2003). As the State correctly notes, Menzies' 60(b) motion filed on April 11, 2002, did not meet either of these requirements. The State asserts that Menzies therefore did not file a proper motion until nineteen months after the district court entered judgment, when Hunt filed the supporting memorandum. According to the State, this renders Menzies' 60(b) motion untimely.

¶ 68 The problem with the State's argument is that the State fails to distinguish between a motion that is properly supported for purposes of the particularity requirement and a motion that is timely filed for purposes of avoiding the limitations provisions of 60(b). Both rule 7 and rule 4–501 are designed to "promote the policies of (1) mitigating prejudice to opposing parties by allowing that party to respond to the motion ... and (2) assuring that a court can be apprised of the basis of a motion and rule upon it with a proper understanding." *See Holmes Dev., LLC v. Cook,* 2002 UT 38, ¶ 58, 48 P.3d 895 (discussing requirements for motions to amend). If a party fails to "comply with Utah's formal motion practice rules," a district court may, within its discretion, deny the motion on the grounds that it is insufficient. *Id.* ¶ 59. However, sufficiency is not a logically necessary component of timeliness. A party can timely move the court for relief despite the fact that its motion may be insufficient because, for example, it lacks particularity. In such a situation, the court has the discretion, consistent with the policy concerns noted above, either to deny the motion as being insufficient or to allow the party to supplement the originally insufficient motion. In the case before us, the

district court chose the latter option, holding that Menzies' 60(b) motion was timely filed and that Menzies should be allowed to supplement the motion under the circumstances. The district court was entirely within its discretion to do so.

¶ 69 We hold that Menzies' 60(b) motion was timely filed. Menzies not only complied with the three-month limitation contained in rule 60(b), but also moved the district court to set aside the default judgment within a reasonable time under the circumstances. Although the motion was not supported until sixteen months later, this delay was due to Brass' deficient representation and the fact that he was misleading Menzies about the status of the case. Menzies was not fully aware of the grounds for relief until August 2003, when Hunt finally informed him of Brass' failures. At that point, Hunt promptly filed a supporting memorandum on Menzies' behalf, and the State had adequate opportunity to oppose Menzies' motion. Moreover, the State acquiesced in the delay during the entire sixteen months. The State never challenged Menzies' motion on the basis of particularity but instead waited nine months and then requested permission to file a late response. The district court never ruled on the State's request, and the State did not raise the issue again. Under these circumstances, the factors militate in favor of Menzies. *See Gillmor*, 850 P.2d at 435 (In assessing whether a movant requested 60(b) relief within a reasonable time, the court considers "such factors as the interest in finality, the reason for delay, the practical ability of the litigant to learn earlier of the grounds relied upon, and prejudice to other parties." (citations and internal quotation marks omitted)). Accordingly, we hold that Menzies' 60(b) motion was timely filed and proceed to address the asserted grounds for relief.

### B. Menzies Is Entitled to Relief Under Rule 60(b)(6)

¶ 70 The second issue we address in our 60(b) analysis is whether Menzies is entitled to relief under any of the subsections of rule 60(b). As noted above, Menzies argues that he is entitled to relief under multiple subsec-tions of rule 60(b). However, the asserted grounds for Menzies' requests for relief are the same in each instance, namely, Brass' deficient representation. Therefore, our initial task is to determine which subsection of rule 60(b) applies to Menzies' arguments. *See Richins v. Delbert Chipman & Sons Co.*, 817 P.2d 382, 385 (Utah Ct.App.1991); *Russell v. Martell*, 681 P.2d 1193, 1195 (Utah 1984). We hold that rule 60(b)(6) applies to Menzies' arguments and therefore do not address Menzies' arguments under the other asserted subsections of rule 60(b).

¶ 71 Rule 60(b)(6) is the "catch-all" provision of rule 60(b). It provides that a party may be relieved from a judgment for "any *other* reason justifying relief from the operation of the judgment." Utah R. Civ. P. 60(b)(6) (emphasis added). Because rule 60(b)(6) is meant to operate as a residuary clause, it may not be relied upon if the asserted grounds for relief fall within any other subsection of rule 60(b). *See Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168 (9th Cir.2002); *Russell*, 681 P.2d at 1195; *Laub v. S. Cent. Utah Tel. Ass'n*, 657 P.2d 1304, 1306–07 (Utah 1982). In other words, the grounds for relief under 60(b)(6) are exclusive of the grounds for relief allowed under other subsections. *See Russell*, 681 P.2d at 1195; *Tani*, 282 F.3d at 1168 & n. 8. Furthermore, relief under rule 60(b)(6) is meant to be the exception rather than the rule; we have previously held that it should be "sparingly invoked" and used "only in unusual and exceptional circumstances." *Laub*, 657 P.2d at 1307–08 (internal quotation marks omitted); *see also Pioneer Inv. Servs. Co. v. Brunswick Assocs.*, 507 U.S. 380, 393, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993) (remarking that under rule 60(b)(6) of the Federal Rules of Civil Procedure, a party must show "extraordinary circumstances"); *Tani*, 282 F.3d at 1168 (same).

¶ 72 Menzies argues that there are exceptional circumstances warranting relief under rule 60(b)(6) because Brass rendered ineffective assistance of counsel and was grossly negligent. While we have not yet had occasion to consider whether conduct such as Brass' warrants relief under 60(b)(6), we have previously examined attorney con-

duct in the context of rule 60(b)(1). Under rule 60(b)(1), a party may obtain relief from a judgment if he or she can demonstrate "mistake, inadvertence, surprise, or excusable neglect." Utah R. Civ. P. 60(b)(1). A judgment entered due to attorney misconduct may be set aside under this subsection only if the conduct is *excusable*. *See Mini Spas v. Indus. Comm'n*, 733 P.2d 130, 132 (Utah 1987). In other words, if the attorney exercised "due diligence," defined as conduct that is consistent with the manner in which a reasonably prudent attorney under similar circumstances would have acted, a judgment may be set aside under 60(b)(1). *Id.* Thus, in *Lund* we held that a default judgment should be set aside because it had been entered due to a "good faith, legitimate" legal interpretation that turned out to be erroneous. 2000 UT 75, ¶¶ 16–19, 11 P.3d 277.

¶ 73 However, the conduct alleged by Menzies here—ineffective assistance of counsel and gross negligence—is a far cry from the "excusable neglect" that warrants relief under 60(b)(1). Menzies does not allege that Brass exercised due diligence or that his failures were due to a good faith interpretation of the law. Rather, Menzies argues that Brass' performance was exceptionally deficient in that he willfully failed to comply with his most basic obligations and consistently misled Menzies about the status of his case. As the district court noted, Brass' "inaction appears to have been willful and deliberate rather than the result of ignorance or carelessness." In other words, Menzies argues that Brass' conduct was *inexcusable*, a proposition with which the district court agreed and which the State concedes on appeal. Menzies' allegations amount to "an extraordinary situation which cannot fairly or logically be classified as mere 'neglect.'" *Pioneer Inv. Servs. Co.*, 507 U.S. at 394 (quoting *Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 93 L.Ed. 266 (1949)). Accordingly, Menzies' asserted grounds for relief cannot be addressed by rule 60(b)(1).

¶ 74 While the district court found that the conduct alleged by Menzies did not fit the criteria of rule 60(b)(1), it also found that it could not grant Menzies relief under 60(b)(6) because it had already considered the conduct under 60(b)(1). This is a misapplication of the law. The rule is that 60(b)(6) cannot be relied upon if the *grounds* for relief fall within another subsection, not that 60(b)(6) does not apply if the court has already *considered* another ground. *See Laub v. S. Cent. Utah Tel. Ass'n*, 657 P.2d at 1306–08. Having concluded that Brass' conduct was too egregious and exceptional to be encompassed by rule 60(b)(1), the district court should have proceeded to consider Menzies' arguments under rule 60(b)(6) instead of concluding that 60(b)(6) could apply only if "extraordinary circumstances [we]re *also* present" (emphasis added).

¶ 75 We therefore draw a distinction between willful or grossly negligent attorney conduct and conduct that amounts to mere negligence or inadvertence. While the latter types of conduct are addressed by rule 60(b)(1), conduct such as that alleged by Menzies is clearly beyond the scope of that subsection and is more properly addressed under 60(b)(6). As the Utah Court of Appeals has noted, "Rule 60(b)(6) is 'sufficiently broad' to permit a court to set aside a judgment for ineffective assistance of counsel." *In re A.G.*, 2001 UT App 87, ¶ 9 n. 3, 27 P.3d 562 (quoting *Stewart v. Sullivan*, 29 Utah 2d 156, 506 P.2d 74, 76 (1973)). Our decision is also consistent with the decisions of the majority of federal courts of appeal that have considered this issue. *See, e.g., Tani*, 282 F.3d at 1169 ("[W]here the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to Rule 60(b)(6)."); *Virginia Info. Sys. Corp. v. Wang Labs, Inc.*, 932 F.2d 338, 342 (4th Cir.1991) ("[A]ttorney malfeasance which actively misleads a client or is comparably culpable might successfully ground a Rule 60(b) motion."); *Carter v. Albert Einstein Med. Ctr.*, 804 F.2d 805, 806, 808 (3d Cir.1986) (reversing denial of a rule 60(b)(6) motion based on attorney's "blatant disregard for explicit [court] orders"); *L.P. Steuart, Inc. v. Matthews*, 329 F.2d 234, 235 (D.C.Cir.1964) (stating that rule 60(b)(6) "is broad enough to permit relief when . . . personal problems of counsel cause him grossly

to neglect a diligent client's case and mislead the client").

¶ 76 Before addressing the merits of Menzies' arguments under rule 60(b)(6), we pause to address an argument raised by the State that is relevant to the distinction we have drawn above. The State argues that Menzies must be held accountable for Brass' failures through principles of agency and therefore Menzies cannot obtain relief under 60(b). The State's position is certainly true as a general proposition: an attorney's negligence is ordinarily attributable to the client because an attorney acts as an agent for her client. *Tani*, 282 F.3d at 1168; *see also Russell*, 681 P.2d at 1195 (holding that attorney's neglect was "attributable to [the client] through principles of agency"). Under the American representative system of litigation, a party voluntarily chooses her attorney and therefore is generally bound by the acts or omissions of his or her attorney. *See Pioneer Inv. Servs. Co.*, 507 U.S. at 396–97, 113 S.Ct. 1489. Under this rule, a court considering whether to set aside a default judgment under rule 60(b)(1) must generally determine whether the actions of both a party *and* his or her counsel are excusable in assessing whether all the surrounding circumstances warrant equitable relief. *Id.* at 397, 113 S.Ct. 1489.

¶ 77 The situation is vastly different, however, when an attorney willfully disregards a client's interests, acts in a grossly negligent fashion, or renders ineffective assistance of counsel. When relief is sought on these grounds under rule 60(b)(6), the client is seeking relief on the basis that his or her attorney "display[ed] neglect so gross that it is inexcusable." *Tani*, 282 F.3d at 1168 (internal quotation marks omitted). In such circumstances, the attorney is not acting on behalf of the client but is blatantly disregard-ing his or her representative capacity and subverting the client's interests. Therefore, "an unknowing client should not be held liable on the basis of a default judgment resulting from an attorney's grossly negligent conduct, and . . . sanctions should be imposed on the lawyer, rather than the faultless client." [9] *Id.* at 1169. To hold otherwise would be to ignore the remedial and equitable nature of rule 60(b). *Id.* at 1169–70. Rule 60(b)(6) is designed to remedy a judgment when exceptional circumstances are present, and it would defeat the purpose of the rule if a client could not obtain relief under that subsection because he or she was held responsible for egregious lawyer misconduct. "When an attorney is grossly negligent . . . the judicial system loses credibility as well as the appearance of fairness, if the result is that an innocent party is forced to suffer drastic consequences." *Id.* at 1170. Furthermore, the justification for imputing the acts and omissions of counsel to his or her client are not present here; Brass was appointed by the district court pursuant to Utah Code section 78–35a–202(2)(a) (2002), which does not entitle Menzies to make a voluntary choice with regard to his counsel.[10] *See, e.g., Tani*, 282 F.3d at 1168 (noting that a lawyer's negligence is ordinarily attributable to the client because the client is "presumed to have voluntarily chosen the lawyer as his representative and agent"). Nor does it appear that Menzies had a choice, for the record indicates that Brass was appointed by the court after a fruitless four-month search yielded no other attorney willing and able to represent Menzies. Accordingly, Menzies' request for rule 60(b) relief cannot be defeated on the basis that he is accountable for Brass' conduct. With this distinction clarified, we now address Menzies' request for rule 60(b)(6) relief, beginning with his argu-

9. This is not to say that a client seeking 60(b)(6) relief cannot be held responsible for his or her own actions. Rule 60(b)(6) "is intended to encompass errors or actions beyond the petitioner's control." *Tani*, 282 F.3d at 1170 n. 11. To the extent that a party seeking relief under rule 60(b)(6) is at fault for the default judgment, the district court may, within its discretion, determine that it would be inequitable to grant relief based on all of the surrounding circumstances.

10. We also note that Menzies is statutorily entitled to appointed counsel under Utah Code section 78–35a–202(2)(a) (2002). Where a litigant is statutorily entitled to counsel, the litigant cannot be held liable for the negligence of his or her attorney. *T.S. v. State*, 2003 UT 54, ¶ 11, 82 P.3d 1104. Holding otherwise would "impermissibly undermine[] her right to counsel." *Id.*

ments that Brass rendered ineffective assistance of counsel.

### 1. Menzies is entitled to relief under rule 60(b)(6) because Brass rendered ineffective assistance of counsel

¶ 78 As discussed above, egregious lawyer misconduct constitutes an exceptional circumstance that may allow a litigant relief from a default judgment under rule 60(b)(6). Menzies argues that Brass' actions in this case amount to ineffective assistance of counsel and thus he is entitled to relief under rule 60(b)(6). Before addressing whether Brass' actions qualify as ineffective assistance of counsel, however, we must determine whether Menzies has a right to the effective assistance of counsel. Menzies advances three arguments on this point: (1) he has a statutory right to the effective assistance of counsel pursuant to Utah Code section 78-35a-202 (2002); (2) he has a right to the effective assistance of counsel under the Utah Constitution; and (3) he has a right to the effective assistance of counsel under the United States Constitution.

¶ 79 Several sections of the Utah Code are relevant to Menzies' first argument. Section 78-35a-202(1) provides that "[a] person who has been sentenced to death and whose conviction and sentence has been affirmed on appeal shall be advised in open court, on the record . . . of the provisions of this chapter allowing challenges to the conviction and death sentence and the appointment of counsel for indigent defendants." In addition, section 78-35a-202(2)(a) states as follows:

> If a defendant requests the court to appoint counsel, the court shall determine whether the defendant is indigent. . . . If the court finds that the defendant is indigent, it shall promptly appoint counsel who is qualified to represent defendants in death penalty cases as required by Rule 8 of the Utah Rules of Criminal Procedure.

Finally, section 78-35a-202(2)(b) provides that "[a] defendant who wishes to reject the offer of counsel shall be advised on the record by the court of the consequences of the rejection before the court may accept the rejection."

¶ 80 In *T.S. v. State*, 2003 UT 54, 82 P.3d 1104, we considered an argument very similar to that made by Menzies, albeit in the context of a proceeding to terminate parental rights. In that case, the petitioner's parental rights had been terminated, and her appointed counsel had failed to file an appeal within thirty days, as required by rule 4(a) of the Utah Rules of Appellate Procedure. *Id.* ¶¶ 1-3. The petitioner moved to file an overdue notice of appeal, arguing that the failure should be excused due to "excusable neglect or good cause" under rule 4(e) of the Utah Rules of Appellate Procedure. *Id.* ¶ 1. The district court denied the motion, and the Utah Court of Appeals affirmed, relying on the principle that a party is accountable for her attorney's neglectful conduct. *Id.* ¶¶ 4-5.

¶ 81 On certiorari review, we reversed the court of appeals, holding that "rule 4(e)'s 'good cause' exception . . . includes within its reach the unusual circumstance where a person who is entitled to appointed counsel under [the Utah Code] does not receive effective counsel." *Id.* ¶ 9. Citing Utah Code section 78-3a-913(1)(a) (1999)—which contains language that is strikingly similar to section 78-35a-202(1)(a)—we stated that "[t]he legislature has expressly codified a parent's right to be represented by counsel at every stage of a termination proceeding." *Id.* ¶ 7. We noted that "the statute would be meaningless or illusory if it guaranteed only ineffective assistance of counsel. The legislature's omission of 'effective' should not be read to suggest an intent to provide only ineffective assistance of counsel." *Id.* (internal quotation marks omitted).

¶ 82 Our analysis in *T.S.* is equally applicable to the case before us. "[B]y extending the right to appointed counsel to [death penalty defendants in post-conviction cases], our legislature has expressly recognized that [these] proceedings are unlike the traditional civil case." *Id.* ¶ 6. This intent is consistent with our habeas corpus jurisprudence and with the underlying nature and policy of post-conviction death penalty proceedings. Given the high stakes inherent in such proceedings—life and liberty—providing a petitioner the procedural safeguard of appointed counsel is an important step in

assuring that the underlying criminal conviction was accurate. We refuse merely to pay lip service to this legislatively created protection by holding that a petitioner in a post-conviction death penalty proceeding is only entitled to ineffective assistance of appointed counsel. Therefore, we hold that Menzies has a statutory right to effective assistance of counsel under Utah Code section 78–35a–202.

¶ 83 The State makes two arguments regarding section 78–35a–202. The State first asserts that we should not establish a statutory right to the effective assistance of counsel because, by providing that appointed counsel must meet the qualifications of rule 8, the legislature has presumptively established the boundaries of counsel's obligations in post-conviction cases. This argument drastically oversimplifies the intent and import of rule 8. Consistent with section 78–35a–202(2)(a), rule 8 requires a court to appoint counsel to represent indigent petitioners in post-conviction proceedings challenging a death sentence. Utah R. Crim P. 8(e). The subsections of rule 8(e) contain qualifications that an appointed attorney in such cases must meet.[11] See Utah R. Crim P. 8(e)(1)-(5). However, these subsections contain no provisions regarding appointed counsel's *obligations* in post-conviction death penalty proceedings. In fact, rule 8(f) expressly states that "[m]ere noncompliance with this rule ... shall not of itself be grounds for establishing that appointed counsel ineffectively represented the defendant." Therefore, the rule clearly contemplates that the standards for ineffective assistance of counsel in post-conviction death penalty cases are found elsewhere. Nor could such gaps in the statutes and rules applicable to post-conviction death penalty proceedings presumptively limit this court's constitutional authority over such cases. As the United States Supreme Court has stated, "When faced with such gaps in the habeas statute, we have looked first to the considerations underlying our habeas jurisprudence, and then determined

whether the proposed rule would advance or inhibit these considerations by weighing the marginal costs and benefits of its application on collateral review." *O'Neal v. McAninch*, 513 U.S. 432, 445, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995) (citation and internal quotation marks omitted).

¶ 84 The State also argues that "writing an effective assistance requirement into section [78–35a–202] would make capital post-conviction litigation interminable and end the finality of death sentences." It is true that there is a general judicial policy favoring the finality of judgments. *See Hurst*, 777 P.2d at 1035. However, "[a]s important as finality is, it does not have a higher value than constitutional guarantees of liberty." *Id.* We would be remiss in our constitutional role if we were to allow finality to trump the interests at stake in post-conviction death penalty proceedings. *See id.* at 1033 (discussing the judiciary's constitutional supervisory power over extraordinary writs). Moreover, Utah's post-conviction legislation and associated rules contain appropriate limitations to assist courts in streamlining post-conviction review in death penalty cases. *See, e.g.*, Utah Code Ann. § 78–35a–106 (2002) (discussing various grounds under which relief may be precluded); Utah R. Civ. P. 65C (containing procedural provisions governing the progression of post-conviction litigation). We are confident that the judiciary, relying on this framework as well as the common law, can properly advance post-conviction death penalty litigation while ensuring that petitioners receive the protections to which they are legally entitled. Because we conclude that Menzies has a statutory right to the effective assistance of counsel under section 78–35a–202(2)(a), we do not address his federal and state constitutional claims. We do, however, note that the United States Supreme Court has previously declined to recognize a federal constitutional right to the effective assistance of counsel in state post-conviction proceed-

---

**11.** This case illustrates an ironic deficiency in the operation of rule 8. Brass, who apparently met all of the rule's technical requirements, was nonetheless unqualified to serve as counsel in this capital case, as reflected by his performance and by his admissions that he did "not understand the complex procedural rules governing

capital cases in state and federal post-conviction" proceedings and that he "cannot adequately represent a capital defendant in post-conviction cases." Thus, rule 8 obviously creates a minimum standard, but does not ensure qualification.

ings. *Coleman v. Thompson*, 501 U.S. 722, 755–57, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). While we have not yet considered whether such a right exists under the Utah Constitution, there is no need to do so in this case because of the statutory right provided by section 78–35a–202. We do not foreclose the possibility that an indigent death row inmate may have a right to the effective assistance of counsel under the Utah Constitution, but that question must wait for another day.

¶ 85 Having established that Menzies has a statutory right to the effective assistance of counsel, we now address whether he has demonstrated that Brass' performance was ineffective. The analytical framework for assessing ineffective assistance of counsel was originally developed by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In the federal context, the right to the effective assistance of counsel is premised on a defendant's right to counsel under the Sixth Amendment to the United States Constitution. *Id.* at 687, 104 S.Ct. 2052. As the Supreme Court has noted, this right is designed to ensure that criminal defendants receive a fair and reliable proceeding before life or liberty are taken. *Id.* at 686, 104 S.Ct. 2052; *see also Roe v. Flores–Ortega*, 528 U.S. 470, 482, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000) (noting that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair [proceeding]" (citation and internal quotation marks omitted)). This fairness is "derive[d] from the adversarial nature of our justice system, which is premised on the 'well-tested principle that truth—as well as fairness—is best discovered by powerful statements on both sides of the question.' " *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir.2005) (quoting *Penson v. Ohio*, 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988)); *see also Strickland*, 466 U.S. at 688, 104 S.Ct. 2052 (recognizing "the law's presumption that counsel will fulfill the role in the adversary process that the [Sixth] Amendment envisions"). The right to the effective assistance of counsel therefore ensures the fairness and reliability of proceedings by requiring counsel to adequately discharge his or her role in the adversary process. *See, e.g., Flores–Ortega*, 528 U.S. at 482, 120 S.Ct. 1029 (discussing how the *Strickland* test requires a litigant to "show[ ] how specific errors of counsel undermined the reliability of the [proceedings]" (citation and internal quotation marks omitted)); *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052 ("The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding."). Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052.

¶ 86 The State argues that we should not rely on the Supreme Court's Sixth Amendment jurisprudence in assessing Menzies' statutory right to effective assistance of counsel. However, this court has long relied upon the *Strickland* test to assess ineffective assistance of counsel claims. *See Bundy v. Deland*, 763 P.2d 803, 805 (Utah 1988). We can discern no reason why a statutory right to effective assistance of counsel should be premised on something different from that of the constitutional right: ensuring that the proceeding is reliable and fair by requiring a properly functioning adversarial process. *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. Menzies is no less entitled to a proceeding that meets these standards when counsel is required by statute than he would be if counsel were required by the Constitution. The underlying concern is the same in each instance: when an indigent litigant has a legal right to counsel, counsel must render effective assistance in order to give effect to the litigant's right. *See T.S.*, 2003 UT 54, ¶ 11, 82 P.3d 1104. We therefore use *Strickland* to evaluate Menzies' claim.

¶ 87 The *Strickland* test for assessing whether an attorney's performance amounted to the ineffective assistance of counsel is two-part: (1) whether counsel's performance was deficient in that it "fell

below an objective standard of reasonableness"; and (2) whether counsel's performance was prejudicial in that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688–89, 694, 104 S.Ct. 2052. If a litigant meets both parts of this test, then the proceeding is inherently unreliable and the result cannot stand. *See Bell v. Cone,* 535 U.S. 685, 695, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). We examine each part of the *Strickland* test in turn.

a. Brass' performance falls below an objective standard of reasonableness

 ¶ 88 Our first inquiry under the *Strickland* test is whether Brass' performance was unreasonably deficient. This issue is not disputed. Though the district court did not engage in a thorough *Strickland* analysis, it stated in its 60(b) ruling that Brass' actions "were inexplicable failures to follow rudimentary procedural guidelines and comply with court-ordered deadlines" and that "the ineffective assistance of counsel exceeds any neglectful conduct that could be deemed 'excusable.'" The State does not contest this finding on appeal, but instead concedes that Brass' performance was deficient. We nevertheless discuss the first part of the *Strickland* analysis in order to clarify Utah's standards for the performance of counsel in post-conviction death penalty proceedings.

 ¶ 89 Under *Strickland,* an attorney's performance must be objectively reasonable, with reasonableness measured by "prevailing professional norms." 466 U.S. at 688, 104 S.Ct. 2052. However, "judicial scrutiny of counsel's performance must be highly deferential" because "it is all too easy for a court, examining counsel's [performance] after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. Therefore, the court must "eliminate the distorting effects of hindsight ... and ... evaluate the conduct from counsel's perspective at the time." *Id.* This requires that the court "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In order to overcome this presumption, the litigant must demonstrate that the challenged actions cannot be considered sound strategy under the circumstances. *Id.*

 ¶ 90 Menzies requests that we consult the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Death Penalty Guidelines) in addressing whether Brass' representation was reasonable under the circumstances. Courts frequently rely on the professional standards established by the ABA when determining the relevant professional norms under the first prong of the *Strickland* analysis. *See, e.g., Rompilla v. Beard,* 545 U.S. 374, 375, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing the ABA Death Penalty Guidelines and stating that "[w]e long have referred [to these ABA Standards] as guides to determining what is reasonable" (second alteration in original) (citations and internal quotation marks omitted)); *Florida v. Nixon,* 543 U.S. 175, 191, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004) (citing ABA Death Penalty Guidelines in addressing ineffective assistance under *Strickland*); *Canaan v. McBride,* 395 F.3d 376, 384 (7th Cir.2005) ("We follow the [Supreme] Court's lead ... by looking first to the [ABA Death Penalty Guidelines]."). Indeed, the Supreme Court referred to the ABA Death Penalty Guidelines in *Strickland* itself, noting that the guidelines reflect "[p]revailing norms of practice." 466 U.S. at 688, 104 S.Ct. 2052. While the ABA standards are not determinative of whether counsel's performance was ineffective and courts should examine counsel's conduct in light of all the contemporary circumstances, *id.* at 688–89, 104 S.Ct. 2052, they do represent "well-defined norms" that provide guidance to courts. *Wiggins v. Smith,* 539 U.S. 510, 524, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Because Utah's post-conviction rules do not currently contain any provisions regarding counsel's performance in post-conviction death penalty proceedings, and because it is traditionally the duty of the courts to super-

vise the performance of counsel,[12] we rely on the ABA Death Penalty Guidelines to the extent they are relevant to our decision.

¶ 91 ABA Death Penalty Guideline 10.15.1 specifically details the duties of post-conviction counsel. This guideline imposes on post-conviction counsel the duty to "fully discharge the ongoing obligations imposed by these guidelines." ABA Death Penalty Guideline 10.15.1(E) (2003). One of these obligations is the duty to "maintain close contact with the client regarding litigation developments." Guideline 10.15.1(E)(1). This duty is discussed in depth in guideline 10.5, which states that counsel "should maintain close contact with the client," guideline 10.5(A) (2003), including discussing with the client "the progress of and prospects for the factual investigation, and what assistance the client might provide," guideline 10.5(C)(1). Counsel should also keep the client informed of "litigation developments," guideline 10.15.1(E)(1), including "litigation deadlines and the projected schedule of case-related events," guideline 10.5(C)(6). The commentary to guideline 10.5 makes clear that counsel is obligated "at every stage of the case to keep the client informed of developments and progress in the case" and that "the failure to maintain such a relationship is professionally irresponsible." Guideline 10.5 cmt.

¶ 92 In addition to the duty to communicate, guideline 10.15.1 also imposes on counsel the duty "to continue an aggressive investigation of all aspects of the case." Guideline 10.15.1(E)(4). Likewise, guideline 10.7 provides that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." Guideline 10.7(A). As the commentary to guideline 10.7 notes, counsel has a "duty to take seriously the possibility of the client's innocence, to scrutinize carefully the quality of the state's case, and to investigate and re-investigate all possible defenses." Guideline 10.7 cmt. The duty to investigate extends to the penalty phase, and counsel has a "duty to investigate and present mitigating evidence." Guideline 10.7 cmt.; see also Williams v. Taylor, 529 U.S. 362, 395–96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (holding that counsel was ineffective for failing to uncover and present mitigating evidence). These "parallel tracks" of investigation also apply in post-conviction proceedings, where post-conviction counsel has a duty to investigate "the facts underlying the conviction and sentence, as well as such items as trial counsel's performance." ABA Death Penalty Guideline 10.15.1 cmt. Counsel also has a duty to investigate the client in order "to discover mitigation that was not presented previously [and] also to identify mental health claims." Guideline 10.15.1 cmt.

¶ 93 Finally, guideline 10.15.1 provides that "[p]ost-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation." In addition, guideline 10.8 provides that "[c]ounsel at every stage of the case, exercising professional judgment," must "consider all legal claims potentially available" and "thoroughly investigate the basis for each potential claim before reaching a conclusion as to whether it should be asserted." Guideline 10.8(A)(1)-(2) (2003).[13]

¶ 94 In the case before us, Brass' ineffective representation went far beyond a failure to comply with the ABA Death Penalty Guidelines. During the five and a half years that Brass represented Menzies, Brass provided Menzies with virtually no representation and willfully disregarded nearly every aspect of Menzies' case. Brass did not communicate with Menzies about the status or progress of his case, repeatedly refusing Menzies' telephone calls and failing to re-

12. While Utah's current post-conviction legislation and rules do not contain any standards for the performance of post-conviction counsel, rule 25–14–6 of the Utah Administrative Code clearly contemplates that the court may order the withdrawal of counsel due to "counsel's improper conduct." Utah Admin. Code r. 25–14–6(2) (2001).

13. We do not read this guideline to require or encourage the litigation of issues that are clearly procedurally barred, although we recognize that whether an issue is so precluded must often be explored and raised by counsel.

spond to Menzies' written correspondence. These actions kept Menzies in the dark about the procedural posture of his case. Indeed, Brass did not inform Menzies that his case had been dismissed until nearly a year after summary judgment was entered, and Menzies was not aware of Brass' repeated discovery defaults and the resulting sanctions until Hunt began representing him. Moreover, Brass purposely misled Menzies to believe that the summary judgment was not a problem, informing Menzies that he was doing what was necessary to have it set aside, despite the fact that he never filed a memorandum supporting the rule 60(b) motion and defaulted in Menzies' appeal from the summary judgment several times.

¶ 95 In addition, Brass never conducted any investigation, despite the availability of investigative funds, a voluminous record indicating that investigation was necessary in order to develop Menzies' claims, and his own awareness of that necessity. During the course of Brass' representation, Menzies repeatedly asked Brass to investigate issues pertaining to both actual innocence and ineffective assistance of trial counsel. Brass disregarded Menzies' requests and then sat by as the State served discovery on Menzies because Brass had developed no factual bases for Menzies claims. Brass never informed the court that he could not respond to the State's discovery requests because he had not developed the case and never objected when sanctions were imposed that effectively precluded Menzies from pursuing his claims. Nor did Brass litigate the issues that were present in the case when he undertook Menzies' representation. The second amended petition Brass filed on Menzies' behalf was little more than a repetition of the claims that had been asserted in the first amended petition filed three years earlier, and Brass did not oppose the State's motion to dismiss most of Menzies' asserted claims. In short, Brass gradually defaulted Menzies' post-conviction case away and never informed Menzies that he was doing so.

¶ 96 There is no question that Brass' actions under these circumstances constitute ineffective assistance of counsel. While counsel's actions are normally entitled to a presumption of reasonableness, Brass' willful disregard for Menzies' case cannot possibly be construed as sound strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. 2052; *see also Flores–Ortega*, 528 U.S. at 477, 120 S.Ct. 1029 (holding that "a lawyer who disregards specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable" because such a failure "cannot be considered a strategic decision; filing ... is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes"). Brass' representation falls far "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052, and therefore Menzies has satisfied the first prong of the *Strickland* test.

b. Brass' conduct rendered the post-conviction proceedings unreliable, thereby prejudicing Menzies' case

¶ 97 Our second inquiry under the *Strickland* test is whether Brass' actions prejudiced Menzies' case. Under this portion of the analysis, a litigant is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Judicial proceedings are normally entitled to "a strong presumption of reliability," and therefore a litigant must overcome this presumption by demonstrating that counsel's errors rendered the proceeding unreliable. *Flores–Ortega*, 528 U.S. at 482, 120 S.Ct. 1029 (citations and internal quotation marks omitted).

¶ 98 However, if a litigant is constructively denied the assistance of counsel in a proceeding in which he or she is entitled to counsel, the adversary process itself is rendered inherently unreliable, and prejudice is legally presumed. *See id.* at 483, 120 S.Ct. 1029; *Strickland*, 466 U.S. at 692, 104 S.Ct. 2052. A litigant can be constructively denied counsel in several ways. For example, a constructive denial of counsel occurs if counsel completely fails to subject the opposition's case to meaningful adversarial testing. *See*

*Bell,* 535 U.S. at 696, 122 S.Ct. 1843; *Collins,* 430 F.3d at 1265; *Turrentine v. Mullin,* 390 F.3d 1181, 1208 (10th Cir.2004). In *Turrentine,* the Tenth Circuit stated this occurs "where the evidence overwhelmingly establishe[s] that [the] attorney abandoned the required duty of loyalty to his client, and where counsel acted with reckless disregard for his client's best interests and, at times, apparently with the intention to weaken his client's case." 390 F.3d at 1208 (second alteration in original) (citation and internal quotation marks omitted). In *Collins,* the Tenth Circuit expanded upon this reasoning and held that an attorney failed to subject the opposition's case to meaningful adversarial testing—despite not recklessly disregarding his client's interests—because he did not argue his client's position at a competency hearing due to a pending motion to withdraw. 430 F.3d at 1265. The court noted that the proceeding was inherently unreliable because counsel had "not engage[d] his legal skills in advocating [his client's] position." *Id.* at 1266.

¶ 99 Constructive denials of counsel have also been found where, due to counsel's deficient performance, a proceeding itself is forfeited. *See Flores–Ortega,* 528 U.S. at 483–84, 120 S.Ct. 1029. A "denial of the entire judicial proceeding itself, which a [litigant] wanted at the time and to which he had a right, ... demands a presumption of prejudice" because the litigant has been entirely denied the adversary process. *Id.* at 483, 120 S.Ct. 1029. Because no presumption of reliability can be accorded "to judicial proceedings that never took place," a forfeiture due to counsel's deficient representation renders the proceedings inherently unreliable. *Id.*

¶ 100 Whether a litigant is required to show actual prejudice or whether prejudice is instead presumed "turns on the magnitude of the deprivation of the right to effective assistance of counsel." *Id.* at 482, 120 S.Ct. 1029. In this case, Brass' abdication of his duties was of sufficient magnitude to presume prejudice and meets both of the exceptions discussed above. First, Brass completely failed to provide meaningful adversarial testing because he took no actions to develop Menzies' case and did not respond to any of the State's various motions. Brass not only acted with reckless disregard for Menzies' case, but he willfully disregarded nearly every aspect of it. Second, Brass' actions effectively forfeited the entire post-conviction proceeding itself. Brass never responded to the State's repeated discovery requests and never informed Menzies or the court of his failures or the reasons for them. The result is that discovery sanctions were imposed preventing Menzies from doing anything to establish his grounds for relief. After the discovery sanctions were imposed, there were no disputed issues of material fact because no facts had been introduced to support Menzies' claims, and the district court granted summary judgment in favor of the State. In summary, Brass' performance not only failed to subject the State's case to the crucible of meaningful adversary testing but also resulted in the denial of the post-conviction proceeding itself. Under these circumstances, Brass' actions were clearly prejudicial. Accordingly, Menzies is entitled to relief under rule 60(b)(6).

2. Menzies is entitled to relief under rule 60(b)(6) because Brass' actions were grossly negligent

¶ 101 In addition to arguing that he is entitled to relief under rule 60(b)(6) due to Brass' ineffective assistance of counsel, Menzies also argues that he is entitled to relief on the independent ground that Brass' actions were grossly negligent and therefore constitute exceptional circumstances under 60(b)(6). As discussed above, both grounds constitute exceptional circumstances that warrant relief under 60(b)(6). While a litigant must have a right to the effective assistance of counsel in order to seek relief on that ground, relief under 60(b)(6) may also be sought where a lawyer's performance is grossly negligent and therefore not excusable under rule 60(b)(1). *See Cmty. Dental Servs. v. Tani,* 282 F.3d 1164, 1170 n. 11 (9th Cir. 2002).

¶ 102 While it dealt with this issue in a purely civil context, *Tani* is remarkably similar to the case at bar. There, the defendant was sued on grounds of trademark infringe-

ment and retained counsel to represent him. *Id.* at 1166. The parties agreed to extend the time for filing the defendant's answer, but the defendant's counsel failed to sign the stipulation and also failed to file a timely answer. *Id.* The plaintiff filed for default, only to learn that an answer had been filed one day before, two weeks late. *Id.* Having not received a copy, the plaintiff telephoned the defendant's counsel, who assured the plaintiff that he would send a copy. *Id.* However, the defendant's counsel failed to do so. *Id.* At a subsequent hearing, the magistrate judge ordered the defendant's counsel to serve the answer and to participate in a settlement conference call. *Id.* at 1167. When the defendant's counsel failed to do either of these things, the plaintiff moved to strike the answer and again asked for a default judgment. *Id.* The defendant's counsel failed to file a memorandum in opposition and, at a hearing on the plaintiff's motion, still did not provide the plaintiff with a copy of the answer. *Id.* Therefore, the magistrate judge granted the plaintiff's motions. *Id.*

¶ 103 During this entire course of events, the defendant's counsel represented to the defendant that the case was proceeding smoothly. *Id.* It was not until the order of default judgment was mistakenly mailed to the defendant's office that he became aware of his counsel's failures. *Id.* The defendant promptly retained new counsel and filed a motion to set aside the default judgment pursuant to rule 60(b) of the Federal Rules of Civil Procedure. *Id.* The district court denied the motion, finding that although counsel's actions were not "excusable" under rule 60(b)(1), those actions were still chargeable to the defendant. *Id.* at 1167 & n. 6. The court also found that relief was not warranted due to the defendant's "own 'culpable conduct.'" *Id.* at 1167.

¶ 104 On appeal, the Ninth Circuit reversed the district court. *Id.* at 1166. The court held that while an attorney's negligent acts are ordinarily chargeable to the client, a client should not be held liable for the attorney's actions where those actions are grossly negligent. *Id.* at 1168–69. It also held that grossly negligent conduct constitutes exceptional circumstances that entitle a litigant to

relief under rule 60(b)(6). *Id.* The court then noted that the defendant's counsel had performed in a grossly negligent fashion because his failures were "inexcusable and inexplicable" and that he had "virtually abandoned his client." *Id.* at 1170. The court also noted that the attorney had deliberately misled his client by repeatedly assuring the client that he "was performing his responsibilities," thereby "depriving him of the opportunity to take action to preserve his rights." *Id.* at 1171. While the court did note that a litigant's *own* culpable conduct could serve as grounds for a court to deny a rule 60(b)(6) motion, the court's review of the record did not demonstrate culpable conduct on the part of the defendant. *Id.* at 1172. Therefore, the court held that the district court had abused its discretion by denying the defendant's rule 60(b)(6) motion. *Id.*

¶ 105 In this case, the district court abused its discretion by denying Menzies' rule 60(b)(6) motion because Brass' conduct was grossly negligent. As in *Tani*, Brass repeatedly failed to comply with straightforward procedural requirements and court-ordered deadlines. He took no action to build Menzies' case and allowed the State to obtain a default judgment by failing to respond to discovery. Thus, Brass "virtually abandoned his client." *See id.* at 1170. He also misled Menzies about the procedural posture of his case, the result being that Menzies was not fully aware of Brass' failures until years after they occurred. This conduct clearly constitutes gross negligence, entitling Menzies to relief under rule 60(b)(6).

¶ 106 Before addressing whether Menzies has met the meritorious defense requirement, it is necessary first to address one additional portion of the district court's 60(b) ruling. The district court found that Menzies was not entitled to 60(b) relief because he "intentionally acquiesced in the delay of his case." In coming to this conclusion, the court relied on our holding in *T.S. v. State*, 2003 UT 54, 82 P.3d 1104. In that case, we held that "good cause" for extending the time to file an overdue notice of appeal under rule 4(e) of the Utah Rules of Appellate Procedure encompasses the situation where a litigant's failure to file a timely

notice of appeal is due to the violation of a statutory right to the effective assistance of counsel. *Id.* ¶ 9. However, we also noted that "a party's own negligent or intentional acts might render rule 4(e) relief inequitable, notwithstanding a showing of ineffective assistance of counsel." *Id.* ¶ 12. Based on this language, the district court found that Menzies was required to "exercise that level of diligence that a reasonably prudent person in his circumstances would exercise." The district court found that Menzies was not reasonably prudent because he retained Brass as his attorney and failed to inform the court about Brass' failures. Thus, the district court denied Menzies 60(b) relief on this basis.

¶ 107 It is true that in considering a rule 60(b) motion, the district court must take into consideration all of the attendant circumstances in order to determine whether rule 60(b) relief is equitable. *See Katz v. Pierce,* 732 P.2d 92, 93 n. 2 (Utah 1986); *Olsen v. Cummings,* 565 P.2d 1123, 1124 (Utah 1977). To the extent that a litigant has acted negligently or intentionally, a court may consider these acts in striking an equitable balance between finality and allowing the litigant a fair hearing, notwithstanding the gross negligence or ineffective assistance of counsel. *See Tani,* 282 F.3d at 1172; *T.S.,* 2003 UT 54, ¶ 12, 82 P.3d 1104. However, a rule 60(b) ruling must be based on adequate findings of fact. *Lund v. Brown,* 2000 UT 75, ¶ 9, 11 P.3d 277. In this case, our review of the record leads us to the conclusion that the district court clearly erred on the record facts in finding that Menzies was negligent. The record indicates that Menzies was unaware of the status of his case during most of the time Brass was representing him. Indeed, he was not aware that a default judgment had been entered until a year after the district court granted summary judgment in favor of the State. When Brass informed Menzies of the default, he also assured Menzies that he was taking steps to have it set aside, and Menzies relied on his representation. Moreover, Menzies was not informed of the reasons for the default judgment and of Brass' multiple discovery failures until Hunt began representing him; prompt steps to set aside the de-

fault judgment were then taken. Finally, the record indicates that Menzies kept Brass as his attorney despite his concerns about the progress of his case because Brass and other attorneys repeatedly told Menzies that Brass would provide effective representation. Therefore, we hold that the district court's findings that Menzies was negligent for keeping Brass as his attorney and for failing to contact the court regarding Brass' failures were clearly erroneous; and we also hold that the district court abused its discretion by denying Menzies rule 60(b) relief on this ground.

### C. Menzies Meets the Meritorious Defense Requirement

¶ 108 The final inquiry in our rule 60(b) analysis is whether Menzies has alleged a meritorious defense. The purpose of the meritorious defense requirement "is to prevent the necessity of judicial review of questions which, on the face of the pleadings, are frivolous." *Lund v. Brown,* 2000 UT 75, ¶ 28, 11 P.3d 277 (citation and internal quotation marks omitted). Thus, a litigant seeking rule 60(b) relief "must proffer some defense of at least sufficient ostensible merit as would justify a trial on the issue thus raised." *Downey State Bank v. Major–Blakeney Corp.,* 545 P.2d 507, 510 (Utah 1976). This requirement does not set an overly burdensome threshold: "A defense is sufficiently meritorious to have a default judgment set aside if it is entitled to be tried." *Erickson v. Schenkers Int'l Forwarders, Inc.,* 882 P.2d 1147, 1149 (Utah 1994). Thus, "where a party presents a clear and specific proffer of a defense that, if proven, would [warrant relief] by the claimant ... it has adequately shown a nonfrivolous and meritorious defense." *Lund,* 2000 UT 75, ¶ 29, 11 P.3d 277. Even "general denials" that would allow a litigant to prevail if proven are sufficient. *Erickson,* 882 P.2d at 1149.

¶ 109 Menzies easily meets the meritorious defense requirement. In his amended petition, Menzies alleged multiple trial errors that, if proven, would allow Menzies to prevail in his post-conviction proceeding. While the record is far from fully developed

with regard to Menzies' claims as a direct result of the ineffective assistance of his counsel, Menzies is not required to prove any of his claims or meet an evidentiary threshold in order to demonstrate that his claims have merit. *Lund,* 2000 UT 75, ¶¶ 29, 32, 11 P.3d 277. Because this final requirement of our 60(b) analysis is met, Menzies is entitled to relief under rule 60(b)(6).

¶ 110 Having concluded that Menzies is entitled to rule 60(b) relief, it is necessary also to consider what relief is warranted. Merely setting aside the default judgment would be insufficient, for the sanctions that were imposed by the district court would still preclude Menzies from investigating his claims. Moreover, Brass' ineffective representation extended well beyond the entry of the discovery sanctions because Brass was willfully neglecting Menzies' case long before the sanctions were imposed. Brass' actions pervade the entire course of his representation, for he took no actions to develop Menzies' case even when he was first appointed. Even the second amended petition filed by Brass, the first pleading he filed, did little more than repeat the allegations of the amended petition that had been filed three years previously. In addition, Brass took no action to oppose the State's motion to dismiss, which disposed of many of Menzies' claims. Thus, in order to fully correct the harm of Brass' ineffective assistance, it is necessary to set aside the entire course of his representation and give Menzies an opportunity to properly develop his case. We do not undertake this decision lightly. The post-conviction proceedings in this case have now extended for eleven years, with no resolution apparent in the immediate future. However, as we have noted repeatedly, while finality in judicial proceedings is an important policy, the constitutional guarantees of life and liberty must prevail in this instance. *See Hurst v. Cook,* 777 P.2d 1029, 1035 (Utah 1989). We simply cannot allow Menzies' sentence to be carried out without allowing him to exercise his right to post-conviction review. In order to ensure that this right is adequately protected, it is necessary that Menzies have the opportunity to investigate his claims and present them to the district court for proper adjudication.

¶ 111 Accordingly, we remand this case to the district court with instructions to set aside the proceedings that took place during the time that Brass was representing Menzies. Menzies should be allowed to investigate his claims in accordance with the pertinent Utah rules and should be given the opportunity to amend his post-conviction petition in the event that it is warranted. We now address Menzies' final claim, relating to the district court's evidentiary rulings during the rule 60(b) proceedings.

## II. THE DISTRICT COURT'S ORDER REGARDING THE DESTRUCTION OF PRIVILEGED DOCUMENTS WAS INSUFFICIENT

¶ 112 Menzies also argues that the district court's order regarding the destruction of documents that were ruled inadmissible at the evidentiary hearing held on January 16, 2004, is insufficient and must be augmented. According to Menzies, the district court erred by ordering that the disputed documents be produced to the State in the first place because the procedure for applying the work product doctrine set forth in *Salt Lake Legal Defender Ass'n v. Uno,* 932 P.2d 589 (Utah 1997), requires the district court to conduct an in-camera review to ensure that the party seeking production meets the *Uno* standard *before* such documents are produced. While Menzies acknowledges that the district court attempted to cure the *Uno* violation by ordering the State to destroy the inadmissible documents, Menzies asserts that the order is insufficient because it does not require the State to identify which documents it had already obtained from independent sources and does not contain any deadline for the documents to be destroyed. We agree with each of Menzies' arguments and therefore order the district court to supplement its order of April 5, 2004, regarding the destruction of the inadmissible documents.

¶ 113 In *Uno,* we considered some of the discovery issues that have pervaded this case since Menzies' post-conviction petition was filed. In that case, LDA had petitioned this court for an extraordinary writ asking that we reverse the district court's denial of its

motion for a protective order. *Id.* at 589. The State had served LDA with subpoenas duces tecum and requests for the production of all documents relating to LDA's representation of Menzies in the underlying criminal trial in order to challenge Menzies' claims that LDA had rendered ineffective assistance. *Id.* LDA asked the district court for a protective order preventing the disclosure of these documents, asserting the work product immunity doctrine, but the district court denied its request and ordered that the documents be produced. *Id.* We vacated the district court's order, concluding that the order violated the work product immunity doctrine. *Id.* at 591.

¶ 114 In *Uno*, we first recited the rule, contained in rule 26(b)(3) of the Utah Rules of Civil Procedure, that attorney work product—defined as " 'documents and tangible things ... prepared in anticipation of litigation' " but not including " 'mental impressions, conclusions, opinions, or legal theories of an attorney' "—is not discoverable unless " 'the party seeking discovery has substantial need' " and cannot obtain the materials elsewhere " 'without undue hardship.' " *Id.* at 589–90 (quoting Utah R. Civ. P. 26(b)(3)) (alteration in original). We then noted that while an attorney's mental impressions are generally not discoverable, there is an exception if those mental impressions are "directly at issue." *Id.* at 590 (citation and internal quotation mark omitted). As we stated in *Uno*, "There is a sense in which the mental impressions, conclusions, and opinions constitute 'the facts' of the case and therefore may be discoverable." *Id.* However, this exception must be applied very carefully in ineffective assistance of counsel cases because a discovery policy whereby counsel's files can be freely accessed in subsequent proceedings has the potential to significantly impair the trial preparation process. *Id.* In order to prevent such a result, we set forth in *Uno* a three-step test that the State must meet when seeking the production of attorney work product in an ineffective assistance case before such documents may be disclosed. *Id.* at 591. For each document sought, the State must demonstrate that (1) "it has 'substantial need' and that it cannot,

without 'undue hardship,' obtain the substantial equivalent of the information by other means," as required by rule 26(b)(3); (2) the "at issue" exception applies to the document; and (3) "the document [has been] edited to prevent the disclosure of information not related to the ineffectiveness claims." *Id.* In *Uno*, we suggested that LDA prepare an index of the documents in its file in order to help the State meet its burden and also instructed the district court to conduct an in-camera review of each document for which the State met the first two requirements in order "to ensure that it does not contain extraneous information that should not be revealed to the State." *Id.*

¶ 115 Applying *Uno* to the issue before us, it is clear that the district court failed to comply with *Uno* by ordering Menzies to produce the disputed documents prior to the January 15 hearing. The materials that the State sought to discover were attorney work product, prepared by Menzies' pro bono counsel in anticipation of litigation, and the State was seeking their production in order to oppose Menzies' claims that Brass had provided ineffective assistance of counsel. Accordingly, the State was required to meet the three-part *Uno* test in order to obtain the documents. Under *Uno*, the State was required to meet this test *before* the documents were produced, not afterward. *Id.* Thus, upon receiving Menzies' index of withheld documents, the district court should have required the State to meet the *Uno* test before ordering the documents' production. The district court's order requiring Menzies to produce the documents was therefore a violation of *Uno*.

¶ 116 To the district court's credit, it appears that the court recognized its error after reviewing *Uno* and attempted to rectify it by ruling the documents the State sought to discover inadmissible and ordering the State to destroy them. However, the court's order did not go far enough. It is clearly a violation of *Uno* and rule 26(b)(3) for the State to have in its possession at this time any documents prepared in anticipation of litigation by Menzies' pro bono counsel or

their agents.[14] If there are documents that were included in Menzies' index of withheld documents that are properly discoverable by the State or that were already in the State's possession due to prior legitimate discovery, then the State need not destroy them. However, the State must identify any such documents and destroy all others post haste. Accordingly, on remand, the district court must require the State to demonstrate which documents it is entitled to keep, order the State to immediately destroy all of the remaining documents,[15] and take all other necessary steps to ensure that the *Uno* violation goes no further.

## CONCLUSION

¶ 117 Although concluding that errors at the district court level require reversal, we note that the trial court functioned with great diligence and effort under extraordinary difficulties in this case. The procedural and substantive defaults of Brass, the extremely adversarial posture and voluminous pleadings of the parties, the extensive and confusing state of the record, and the multiple contested questions of law all posed a great challenge, and the court was thorough in its attention to the case. We take this occasion, however, to emphasize the role that district courts must play in protecting and preserving the integrity of every aspect of capital proceedings.

¶ 118 We hold that the district court abused its discretion by denying Menzies relief under rule 60(b)(6) of the Utah Rules of Civil Procedure. Menzies is entitled to rule 60(b)(6) relief due to the extraordinary circumstances of Brass' ineffective assistance of counsel and grossly negligent representation. In addition the district court erred in its application of *Salt Lake Legal Defender Ass'n v. Uno*, 932 P.2d 589 (Utah 1997), and its discovery ruling must be supplemented. We reverse and remand for proceedings consistent with this opinion.

¶ 119 Justice Durrant, Justice Parrish, and Justice Nehring concur in Chief Justice Durham's opinion.

WILKINS, Associate Chief Justice, concurring in the result.

¶ 120 I concur in the result reached by my colleagues. Given the facts presented, it is simply impossible to understand, much less justify, Mr. Brass' conduct in this case. Calling his behavior here "ineffective" rather understates the case. That alone is enough to require the district court to give Menzies the benefit of the doubt on seeking to set aside the summary judgment granted primarily as a result of Mr. Brass' failure to represent his client's interests in any meaningful way. A total failure to represent one's clients' interests is always ineffective.

¶ 121 Mr. Brass, a classmate of mine from law school, has, in the past, been a fine lawyer doing an excellent job. His passion about the rights of the accused has resulted in his willingness to be assigned the defense of some truly awful individuals charged with hideous acts. He has been an express believer in the right of all citizens to a vigorous defense against charges of criminal behavior brought by the State. He has, on many occasions, reminded judges and juries of Utah that our joint agreement, embodied in both state and federal constitutions, provides the benefit of the doubt to the accused. Periodically, some of the guilty go free as a result of the high burden we have all imposed upon the State to prove our guilt. This allows us to be more certain that only the guilty are punished.

¶ 122 In cases where the death penalty is possible, we have become increasingly more thorough in our appellate review. The motivation for this increased care comes in part from the ever-changing federal constitutional interpretations of the Supreme Court of the United States. One is left with the impression that in time the death penalty, no matter how painlessly or righteously imposed, will

---

14. We note that our holding does not preclude the State from seeking discovery of materials that may be relevant to future litigation in this case, so long as the appropriate tests are met.

15. This order should not be confined to the documents themselves, but should include, for example, copies of the documents, notes taken from the documents, and any other materials made from the documents by the State.

be found violative of the United States Constitution by the high Court. Such a decision, if and when it comes, will no doubt be hotly debated on grounds of "original intent" versus the "living constitution" by those deeply concerned with the topic. Although I harbor an opinion on the question, it does not come into play here whatsoever.

¶ 123 I do not subscribe to the general "framework" discussion offered by my colleagues. In this and other death penalty cases, we universally express concern that society is extracting the ultimate penalty from the defendant convicted of a capital crime. I am troubled by the usual absence of any attempt to demonstrate consideration for the truly innocent victims and their loved ones who are selected by death row inmates as targets for their crimes in the first instance. Moreover, I am deeply troubled by the exacting and seemingly endless requirements to review, re-review, analyze, and re-analyze any possible defect in the proceedings by which those found guilty of crimes so hideous that the death penalty is imposed. The death penalty acts as a deterrent to those put to death, for sure. It does not seem to have any realistic application to anyone else. Based on our experience, a sentence of life without parole may not only be as good a deterrent, but also less expensive to the state, more miserable for the guilty, and more certain for the victims and society.

¶ 124 I am not certain that those convicted of death-eligible offenses against the rest of us deserve the extreme level of attention we extend to them in the name of being absolutely certain of their guilt and that their crime warrants death. I think it might be better to abandon the effort and simply impose a life-long removal from society. I suppose an alternative might be to expend the effort and resources instead in training and educating our children to prevent capital crime in the first place.

¶ 125 Nonetheless, this court has once again extended greater protections to those convicted of capital crimes than recognized by the United States Supreme Court, finding a statutory right to effective assistance of counsel in state post-conviction proceedings. In addition, my colleagues rely in part on ABA Death Penalty Guideline 10.15.1, which provides in part that post-conviction counsel "should seek to litigate all issues, whether or not previously presented, that are arguably meritorious" and, further, assume that Menzies' claim of innocence clearly cries out for factual investigation. I agree with none of these propositions.

¶ 126 It is enough that Mr. Brass utterly failed to represent Menzies' interests in the matter. A total failure of counsel, when counsel is provided by law, is sufficient to get another chance at post-conviction relief. No more is needed in this case.